618 So.2d 554 (1993)
Succession of Ellard Leroy COLE.
No. 92-CA-2639.
Court of Appeal of Louisiana, Fourth Circuit.
April 28, 1993.
R. Chadwick Edwards, Jr., Edwards & Edwards, Abbeville, for appellants.
P. Fred Siegel, New Orleans, for appellee.
Before ARMSTRONG, PLOTKIN and JONES, JJ.
ARMSTRONG, Judge.
Appellant, Louis Cole, appeals from a judgment confirming the validity of the olographic will of his father, Ellard Leroy Cole (Cole). The issues for review are whether the trial court erred in assigning the burden of proof and in upholding the will against challenges of lack of donative capacity and undue influence.
On June 15, 1990, Cole executed an olographic will in favor of his sister-in-law, Thelma Cole (hereinafter "Donee"). It is undisputed that the will is entirely written, dated, and signed in the testator's hand, and is therefore valid in form as an olographic will. See La.C.C. Art. 1588. The will states in its entirety:

*555 This is my will and testament.
I Ellard L. Cole have decided to leave all my possessions personal and real to my sister-in-law Mrs. Thelma Cole excep my house. I want to leave my house to my son Louis Cole at 100 Lamar St. Abbeville. Since my brother died Thelma never changed she has treated me the same. I could not have been treated any different. They were the only family to take me in their home. I cant thank her enough. please see that she get everything I promised.
The will is signed by Ellard L. Cole and three "witnesses," all of whom were present at the party.
Cole died in New Orleans on December 11, 1991, leaving property in Orleans and Vermillion Parishes. He was predeceased by his wife, and his only living issue was his son Louis, the appellant in this matter. For the last nineteen years of his life, Cole had resided in New Orleans under the care and custody of Donee.
A veteran of World War II, Cole returned to the United States with a mental infirmity known as "shellshocked syndrome." From 1946 until 1972 he resided at V.A. Hospitals under the custody of the Veterans Administration. On April 21, 1970, Cole was judged incompetent by a Louisiana Court. In 1972, he was placed under the custody of his brother, Robert Cole, husband of Donee. He resided in their home in New Orleans from 1972 until 1978, and then lived on his own in a nearby apartment. In 1984, Robert Cole died. For the next seven years, Donee assumed sole responsibility for Cole, continuing to feed him daily, wash his clothing and bedding, and to disburse his monthly veterans benefits in satisfaction of his living expenses. Cole was in the care of Donee at the time of his death.
Following Cole's death, Appellant filed a Petition for Confirmation as Administrator in Vermillion Parish on March 2, 1992. On March 23, 1992, Donee filed a Petition for Probate of Olographic Testament in Orleans Parish. By order dated the same day, Cole's olographic will was recorded for execution in Orleans Parish. Appellant subsequently filed a Petition to Annul Testament, and the parties proceeded to trial.
Trial was held August 17, 1992. Sitting as trier of fact, the trial judge heard testimony from Appellant, Donee, one of Cole's brothers, and the three witnesses who signed Cole's olographic testament. On September 3, 1992, the trial court rendered judgment finding the will valid and dismissing Appellant's petition to annul. No reasons for judgment were assigned.
The first issue for review is whether the trial court erred in assigning the burden of proof. In his appellate brief, Appellant alleges that "the trial court declared during pre-trial discussions that the burden of proof would rest with the appellant to first prove that the deceased was mentally infirm before any presumption of invalidity would be imposed upon the testament." There is nothing in the record which indicates that this was the exact pre-trial ruling of the trial court. Furthermore, review of the trial transcript reveals that Appellant correctly assumed the burden of proving undue influence, pursuant to La.C.C. Art. 1479, and that Donee correctly assumed the burden of proving donative capacity, pursuant to La.C.C. Art. 1482.
La.C.C. Art. 1479, nullity of donation procured by undue influence, provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
La.C.C. Art. 1482, proof of capacity to donate, provides:
A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament. However, if the donor made the donation or executed the testament at a time when he was judicially declared to be mentally infirm, then the proponent of the challenged donation or testament must prove the capacity of the donor by clear and convincing evidence.
*556 Under the plain wording of La.C.C. Art. 1479, the party challenging a will on the basis of undue influence must provide "proof that it is the product of influence by the donee." Accordingly, Appellant proceeded as plaintiff at the trial on this matter, attempting to show that Donee exercised undue influence. As part of his case, Appellant introduced exhibits showing that Cole had been judicially declared mentally incompetent. Under La.C.C. Art. 1482, this showing shifted the burden of proof to Donee to prove that Cole had the capacity to make a donation mortis causa. However, nothing in La.C.C. Art. 1479 indicates that a showing of mental infirmity shifts the burden of proof on the issue of undue influence; in fact, the comments to La.C.C. Art. 1477 draw a clear distinction between the two issues: "This Article * * * presumes a donor who has capacity. Obviously, if a donor lacks capacity, then the entire donation or will is invalid for that reason alone, and issues of * * * undue influence are irrelevant." Id., comment (b). Accordingly, when counsel for Appellant rested at the conclusion of Appellant's case, counsel for Donee stated: "Inasmuch as the jurisprudence is certainly clear that the capacity to make a will is tested at the time the will is made, I want to call the witnesses who were there at the time this document was confected." This statement, together with the testimony which followed, shows that Donee assumed the burden of proving capacity.
The record reveals no error in the trial court's assignment of the burden of proof. We therefore confine the remainder of our opinion to the issue of whether the trial court erred in determining whether the parties met their respective burdens of proof.
Donee's showing as to capacity:
La.C.C. Art. 1477, capacity to donate, provides:
To have capacity to make a donation inter vivos or mortis causa, a person must also be able to comprehend generally the nature and consequences of the disposition that he is making.
La.C.C. Art. 1477 was enacted in 1991 and is intended to change the law. Id., comment (a). Comment (c) to La.C.C. Art. 1477 sets forth the following criteria for determining donative capacity: "The donor who is capable of understanding has donative capacity even though he may not actually understand the exact instrument that he executes. * * * The focus under this new test in Louisiana is thus not on the accuracy of the understanding but the ability to understand."
In attempting to prove donative capacity, Donee had to meet the difficult "clear and convincing" standard of proof. La.C.C. Art. 1482. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976). In the instant case, the testimony shows that it is highly probable that Cole understood exactly what he was doing at the time he executed his olographic will.
Donee and the three witnesses to the will all testified as to the following scenario surrounding the drafting of the will: On June 15, 1990, Donee threw a birthday party for her daughter. A few of her daughter's friends showed up. While they gathered in Donee's dining room for cake and ice cream, Cole sat in Donee's kitchen, eating the supper which Donee prepared for him each day. When he finished eating, Cole joined the party in the dining room. After sitting with them for awhile, Cole made a statement to the effect of, "Now would be a good time to make a will, while there are people here to witness it." Paper was produced, and Cole completed a draft in pencil in which he left everything to Donee. Donee told Cole to rewrite the will in ink, and stated that she wanted Cole to leave his house in Abbeville to Appellant. Following Donee's instructions, Cole completed a second draft in ink in which he left everything to Donee except for his house in Abbeville. Donee then suggested that he rewrite the will one more time to eliminate misspellings. Cole subsequently completed a third draft of his will, which was then signed by the three witnesses, all of whom *557 were present throughout the birthday party. The third draft is the version which was probated.
Based on the testimony summarized above, Cole understood exactly what he was doing at the time he executed his will. He drafted the will entirely on his own initiative, and modified it twice in accordance with suggestions from donee. According to witness Lucille Poole, it was Cole himself who suggested that witnesses were needed.
In addition, the testimony overwhelmingly indicates that Cole was in most respects a normal individual. Testifying as to Cole's condition, Donee stated, "He wasn't really normal, but he was close to it. You would never detect anything wrong with him had you not known." Donee explained Cole's general competence in day-to-day living: "He did everything. The only thing I did for him was to prepare his meals, wash hiskept his clothing clean, his bedding, and that's all." Donee also testified that Cole had taken his medication on his own from the time he came to live with she and her husband. The three witnesses to the will reiterated Donee's testimony that Cole appeared to be a normal individual. Witness Lucille Poole, who had known Cole for twenty years, testified that she talked to Cole "all the time," and that "[h]e talked normal to me."
Appellant offered nothing to rebut Donee's showing as to Cole's donative capacity. In fact, some of Appellant's testimony suggests that Cole was capable of quite reasoned thought. Discussing a situation in which he asked his father to come live with him in Abbeville, Appellant summarized Cole's response as follows:
He said, "Son, I'd like that, butI'd like to do that, but I like that my work, the center that I go to"He called it his work, his work. He said he didn't know if it (sic) they had a place around Abbeville that was like that, and I said maybe I could call the V.A. in Lafayette and see if I could find out. And, he said, "Oh, son, that would be too much trouble for you." And, I said, "It wouldn't be no trouble." He said, "I'm happy. Don't worry about it. I'm happy." [tr. 39-40]
Although Cole was declared judicially incompetent by a Louisiana court in 1970, it is clear from the record that he understood exactly what he was doing at the time he drafted his will. Cole had donative capacity within the meaning of La.C.C. Art. 1477 because the evidence shows, clearly and convincingly, that he was "able to comprehend generally the nature and consequences of the disposition that he [was] making."
In a related argument, Appellant asserts that Cole could not have had the requisite donative intent to leave all of his assets to Donee because he was unaware of the extent of his assets. Although Appellant asserts in brief that "[i]n the world of Ellard Cole, his possessions consisted of his household furnishings," there is nothing in the record which indicates that Cole was unaware of the extent of his assets. Furthermore, this argument appears to have been disposed of by the comments to La.C.C. Art. 1477, which outline the following standards for determining donative capacity:
In many respects it [i.e. the new test for donative capacity] is derived from the common-law test for testamentary (donative) capacity that requires a person to be able to understand in a general way the nature and extent of his property * * * In other words, at common law to be competent to make a will, a person must have a general and approximate understanding of the nature and extent of his assets to be disposed of * * *
Id., comments (b) and (c) (emphasis added). See also comment (e). Thus, even if Cole did not know the exact extent of his holdings, such knowledge was not requisite for donative capacity. Cole's will expresses his intention to leave all but his house to Donee, and we see no reason to disturb this expression through a technical finding of "lack of donative intent."
Appellant's showing as to undue influence:
As set forth above, La.C.C. Art. 1479 provides that a donation mortis causa *558 will be declared null if it is "the product of influence by the donee * * * that so impaired the volition of the donor as to substitute the volition of the donee * * * for the volition of the donor." Comment (b) to La.C.C. Art. 1479 explains the subjective nature of a determination of undue influence, and concludes: "Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of the donor and substitute someone else's volition for his own." Appellant has offered nothing to show that Donee exercised anything more grievous than advice and persuasion, together with kindness and assistance, in influencing Cole to execute his will.
Appellant visited Cole only once during the nineteen years Cole lived in New Orleans. Accordingly, his testimony as to Donee's undue influence is highly conjectural, being based largely on impressions Appellant received during Cole's visits to his family in Abbeville, and on the difficulty Appellant experienced in attempting to contact his father in New Orleans.
Up until 1984, when Donee's husband died, Cole visited his family in Abbeville almost every summer. On one such visit, Appellant alleges that his father "told me my aunt wanted him to make a will, and he didn't want to." Appellant did not elaborate on this statement, but later explained his impressions as to the general influence Donee had over Cole: "It sort of likeShe had, how would you say, the power to get him to do what she wanted him to do. * * * the way she talked to him, sort of stern, and something she wanted him to do, she'd tell him to do it, and the way she told him." When asked whether Cole complained about Donee telling him what to do, Appellant stated, "He just told me that [Donee] was sort ofHe didn't use this exact wordexertivebut that's what he meant in so many words." Appellant also alleged that Donee had threatened to send Cole back to the hospital as a means of getting him to do things. When asked why Donee had done this, Appellant replied: "Say, for instance, if he didn't want to take his medicine or something like that, you know. I imagine it was nothing really specific."
Although Appellant visited his father only once in New Orleans, he testified that he asked Donee to put a telephone in his father's apartment. This was never done, and Appellant alleges that numerous attempts to contact his father by calling Donee's home failed because Appellant never returned his calls.
While Donee may have exercised some influence over Cole, Appellant's highly conjectural showing was insufficient to prove that Donee's influence rose to the level contemplated by La.C.C. Art. 1479i.e. that she substituted her own volition for that of Cole. Appellant's showing as to Donee's undue influence is largely contradicted by Donee's testimony. Furthermore, the testimony of Cole's brother, Wilbert Cole (Wilbert), tends to show that the making of a will remained largely in Cole's discretion.
Wilbert testified that shortly before Donee's husband died in 1984, Cole told him that "[Donee] had asked him [Cole] about making a will, but he didn't know too much about making a will because of his son." When Wilbert spoke to Donee about the will, "She said that, `I spoke to [Cole] concerning about a will, but I don't know whether he wants to make a will or not after I been taking care of him.'" These statements tend to show that as of 1984, the making of a will was still very much under Cole's discretion. The fact that Cole did not write a will until seven years later is further indication that Cole was acting under his own volition.
In addition to the above arguments, Appellant has challenged the credibility of Donee and her witnesses, alleging in his appellate brief that "this entire event was staged and orchestrated by the [Donee], at best." Determinations of credibility fall largely within the discretion of the trier of fact, and are reviewed under the manifest error/clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). Donee and the three witnesses to Cole's will have presented a consistent and plausible description of Cole's actions and behavior in drafting *559 the will. Based on our review of the trial transcript, the trial court was neither manifestly erroneous nor clearly wrong in crediting their testimony.
Finally, Appellant argues that Louisiana's forced heirship laws should be declared unconstitutional. This issue was briefed in appellant's pre and post-trial memoranda, but was not ruled on by the trial court. We decline at this time to rule on the issue because the Louisiana Supreme Court currently has under advisement the constitutionality of Louisiana found heirship law. The issue is reserved to the parties contingent upon the Supreme Court's holding. Cole has expressed his donative intent by written testament, and that intent has been upheld by the trial court. In the absence of a successful challenge to the validity of the will itself, we decline to limit Cole's discretion in leaving his property to the person who cared for him during the last nineteen years of his life.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.