631 So.2d 708 (1994)
Jack CORLEY, Plaintiff-Appellant,
v.
Margaret Fisk MUNRO, et al., Defendants-Appellees.
No. 93-713.
Court of Appeal of Louisiana, Third Circuit.
February 2, 1994.
Robert E. Landry, John Michael Veron, Joe J. Tritico, Lake Charles, for Jack Corley.
William T. McCall, Lake Charles, for Margaret Fisk Munro, et al.
Before GUIDRY and YELVERTON, JJ., and BERTRAND[*], J. Pro Tem.
*709 YELVERTON, Judge.
This case is an attack on the testamentary capacity of Alleen Fisk Evans. She died on May 5, 1990, at the age of 98. She left a will dated June 23, 1989, when she was 97. The will named a niece, Margaret Fisk Munro, as her residuary legatee. The will was probated and a judgment of possession was rendered and signed not long after her death.
Jack Corley, the residuary legatee under an earlier will executed by Mrs. Evans in 1986, sued to set aside the judgment of possession recognizing the 1989 will. Corley claimed that Mrs. Evans on June 23, 1989, did not have the requisite mental capacity to make a will. The suit also sought to set aside an amendment to a trust. Mrs. Evans executed the amended trust on the same day that she made her new will. The revocable trust was the bulk of her estate.
The suit alternatively alleged that the execution of the 1989 will and trust amendment was accomplished through duress, force or undue influence, suggestion or captation practiced upon Mrs. Evans, or as a result of error which operated to vitiate her consent.
The district judge who tried the case found that Corley failed to carry his burden of overcoming by clear and convincing evidence the legal presumption of testamentary capacity. The trial judge also rejected as insufficient the evidence of undue influence or error in the confection of the will and the trust amendment. A judgment was signed dismissing Corley's suit. He appealed. We affirm.

GOVERNING LAW
The parties do not dispute the basic principles of law applicable to this case. Both sides cite Succession of Hamiter, 519 So.2d 341 (La.App.2d Cir.), writ denied, 521 So.2d 1170 (La.1988). While they disagree as to the factual similarity of Succession of Hamiter, they agree with its pronouncements with respect to testamentary capacity, burden of proof, and the standard of review. We regard this case as furnishing us the governing principles on this appeal. We quote from page 344 of that case:
In determining testamentary capacity the question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, 452 So.2d 1161 (La.1984).
There is a presumption of testamentary capacity which can only be overcome by clear and convincing evidence. Succession of Lyons, supra. The determination of testamentary capacity is a question of fact upon which the trial judge's findings will not be disturbed unless clearly wrong. Succession of Price v. Price, 448 So.2d 839 (La.App.2d Cir.1984).

THE ISSUE
The single specification of error raised on appeal is that the trial judge was clearly wrong in finding that Corley did not rebut by clear and convincing evidence the presumption that Mrs. Evans possessed testamentary and contractual capacity when she executed the will and trust amendment on June 23, 1989.
What Corley contends is clearly wrong with the decision was the trial court's reliance on the medical opinion of Dr. Gilles Morin. This doctor, a psychiatrist, examined Mrs. Evans on the very day that she executed the will and trust amendment. He testified that she was competent and knew what she was doing. In deciding that Mrs. Evans possessed the requisite testamentary capacity, the trial judge relied mainly on the examination and opinion of Dr. Morin, together with the lay testimony at the trial. Corley argues that Dr. Morin's opinion was unreliable because his examination of Mrs. Evans did not follow standard psychiatric methodology for determining mental status. This is the reason why he claims that reliance on Dr. Morin's opinion was clear error.

BACKGROUND INFORMATION
Before discussing the evidence as it pertains to the issue before us, we will relate, briefly, the context facts. A considerable amount of evidence was admitted about Mrs. Evans, most of it covering the last 20 years of her life.
She was married three times, but never had any children. Her last husband died in *710 1941. Her closest surviving relatives were a niece, Margaret Fisk Munro, and two Fisk nephews.
Her domicile was Lake Charles, Louisiana. She lived alone. She was comfortably well off financially. She liked to travel.
In evidence are some 332 pages of letters she wrote over the years. Judging from the contents of these letters, she was intelligent, literate, and had many interests.
Around 1970 when she was nearing 80, she met Jack Corley, a tour guide, on one of her travels. He was a bachelor, 20 years younger than she. They became friends. In the years that followed she saw him for brief periods and traveled with him occasionally. She also called him on the telephone all over the world, and wrote him many letters.
Corley kept the letters. These are the letters in evidence. They cover the period 1971 to 1984.
Her letters ranged over a variety of subjects, but two themes stood out in nearly every letter she wrote. One was Jack Corley and her fondness for him, and the other was Margaret Fisk Munro and her disappointment with Mrs. Munro and the other members of her family.
She wrote many wills during this time. They will be discussed shortly.
In the summer of 1988, Corley had a travel agency and a real estate brokerage company in Texas. He shut down these businesses and moved to Lake Charles to live with Mrs. Evans and take care of her. He stayed with her for eight months. During this time he arranged to have her examined by Dr. D.S. Paraguya, an internal medicine specialist, to determine her capability to manage her social security benefits. He also made an appointment with the psychiatrist, Dr. Gilles Morin, to talk to him about Mrs. Evans. He went to Dr. Morin's office, but they did not hit it off very well, and he left without having any conversation.
He left Mrs. Evans on May 30, 1989 and went back to Texas. The testimony differs as to why he left. He testified he could not help her anymore, on account of her senility and general physical condition, and that that was why he left. He explained that he could not help her because she had refused to sign a general power of attorney appointing him. Mrs. Munro and her husband testified that Mrs. Evans had become afraid of Corley and wanted him to leave. There was some evidence that Mrs. Munro encouraged Mrs. Evans to run him off. Corley contended that Mrs. Munro lied to her aunt repeatedly about his intentions, and that it was her lies that alienated Mrs. Evans' affections for him and led her to change her will. In any event, he left and he and Mrs. Evans never saw each other again.

MANY WILLS AND MANY LAWYERS
In the last 18 years of her life Mrs. Evans made at least nine wills and had at least seven different lawyers. Five wills were made in the 1970's and four in the 1980's. A 1971 will named three residuary legatees, all non-relatives. Oliver P. Stockwell was her attorney. In 1974, she made a new will to make Jack Corley her sole residuary legatee. A will dated April 8, 1975 continued to name Jack Corley as her residuary beneficiary. N.F. Anderson was her attorney. Margaret Fisk Munro was excluded from this will as she had been from the two earlier wills. On July 29, 1975, she executed another will which was the same as her April 8, 1975 will, except that she removed Elaine Guillory as co-executor with Jack Corley, and made Jack Corley the sole executor. The next year, on March 4, 1976, she executed another will which dropped five names previously appearing as specific legatees. The five were Barton Fisk and Diane Fisk, along with her yard man and two other non-relatives. Still, there were nine specific legatees named in that will.
She changed lawyers for her June 21, 1980 will, this time using Paul E. Palmer. This will still had nine legatees, but again five old ones were dropped and five new ones appeared.
She made two wills in 1986. Only Beverly Johnson remained a familiar legatee in the will dated May 27 of that year; the remaining specific legatees were new. In this will she gave her car, her home, furniture, fixtures and appliances to Felicia Grace Tiller, *711 all her jewelry to Beverly Johnson, and everything else to Jack Corley. The October 2, 1986 will was executed before David L. Sigler. In it, the specific legacies were further reduced. Beverly Johnson is gone. She gave $500 to her maid, Lillian Jacobs, her Spanish shawl to Ann Hutchinson, her mink stole to Janie Tiller, and everything else to Jack Corley.
The October 2, 1986 will was her secondto-last will. This is the one plaintiff, Jack Corley, claims is the last one she did while of sound mind.
Her last will was the one probated, the will now attacked. John F. Wadsack was the attorney-notary in the making of this one, dated June 23, 1989. He represented her the last two years of her life. He testified that in September or October of 1988, not long after Corley moved in, a special checking account was opened for Mrs. Evans. Corley was provided access. In November she became upset about that account and talked to Wadsack about closing it. At this time she also talked about revoking an existing power of attorney she had given Corley in 1980. She put off a decision. In January 1989 she again conferred with Wadsack about Corley's access to her finances. Wadsack found out later that she called the bank and told the bank she was revoking the power of attorney. On April 11, 1989, at a meeting with Mrs. Evans, with Corley present, there was a discussion about her writing a letter to her relatives to block their future contact with her. There was also a discussion about restoring the power of attorney to Corley. Neither the letter nor the power of attorney was ever signed, but a few days later a limited power of attorney was given to Corley. Along about this time, according to Wadsack, she instructed him to draft a codicil to her will naming Margaret Fisk Munro and her two nephews as specific legatees for $2,000 each. He drafted the codicil but it was never executed. On May 26, 1989, she closed the special checking account. A few days later Corley left. On June 9 Mrs. Evans talked to Wadsack about a new will and an amendment to her trust. She wanted to change her residuary legatee from Corley to her niece, Mrs. Munro. This meeting was two hours long. He prepared the new will according to her instructions. On June 13 he went over the draft of the new will with her. This meeting was two and one-half hours long. He testified that in June before the new will was signed he had at least five phone conversations with her, in addition to the meetings. Wadsack testified that in all these meetings and contacts she was alert, asked questions, knew what the drafts did, and was pleased with what they did.
Wadsack testified that he anticipated that Corley would attack the new will. It was for this reason that Wadsack took the precaution of scheduling an examination of Mrs. Evans by a psychiatrist on the day the will was to be executed. As an added precaution, after the psychiatrist told him Mrs. Evans was mentally competent, he had the actual execution of the will videotaped.

MEDICAL EVIDENCE
Three doctors testified, all by deposition. Two of these actually examined Mrs. Evans; the third did not. Only one of the examining physicians examined her with the specific objective of determining testamentary capacity.
Dr. D.S. Paraguya, an internist, testified for Corley. He saw her on March 23, 1989. This was three months before she made her contested will. Corley brought Mrs. Evans to see Dr. Paraguya. The purpose of the examination was for him to see her and fill out a social security form. The doctor got the history from Corley. Including the history, the examination took 20 or 30 minutes. The doctor filled out the social security form. He checked the block that said she was unable to manage benefit payments in her own interest, and wrote down the diagnosis of senility. At the deposition Dr. Paraguya gave the opinion that she suffered from organic brain syndrome, probably secondary to cerebrovascular disease. He determined she had cerebrovascular disease based solely on her age of 97. He felt she was mentally incompetent at that time. However, he testified that it was typical of that disease that it waxes and wanes. He agreed that she could have good days and bad days. Dr. Paraguya never saw her after March 23, 1989.
*712 Dr. Gilles Morin testified for Margaret Fisk Munro. We remind the reader that it was Dr. Morin who examined Mrs. Evans on the very day that she made the contested will, June 23, 1989. He testified that the examination was arranged by her attorney, Wadsack. He saw her in the attorney's office. The purpose of his examination was to evaluate her and try to see if she was mentally competent or incompetent to execute a new will and to amend the trust. He was aware that Wadsack had been counseling her for several weeks and that her previous will and the trust left practically everything to Corley. He was aware that the new will she was going to make would leave practically everything to her niece, Mrs. Munro. To make a mental status evaluation, Dr. Morin explained that he tried to determine her alertness, her awareness, whether she hallucinated, and get some idea as to her intellectual capacity.
From his examination Dr. Morin felt that Mrs. Evans was alert. She was aware of her surroundings. She knew where she was. She was not hallucinating. She was not distorting reality, and she was not paranoid in any way. He mentioned her alertness, how well she was dressed, and her volunteered comments about herself and her life. He said she looked out the window and commented on the weather; she was alert to what was going on. She smiled, indicating a responsiveness to what was going on around her. This was his testimony by deposition as a result of his examination of her on that day.
He testified further that he knew her memory was poor. This was indicated when she gave her age as 80 when in fact it was 97, which later in the examination she admitted after more discussion.
He asked her if she knew why the doctor was seeing her. She responded that she had previously left her estate to Jack Corley but that she was changing her will to leave her estate to her niece. She made the comment that Jack Corley had done something unprincipled and that she was changing her will to leave her property to her niece. This comment was an unsolicited detail. Her comment that Corley had done something that was unprincipled was the only evidence of paranoia that came out in the examination. She did not elaborate, and on that sole item he could not find paranoia.
Dr. Morin testified that he believed she suffered from organic brain syndrome secondary to cerebrovascular arteriosclerosis, a condition common in older people. He said that one of the main factors pointing to organic brain syndrome is loss of memory. She had loss of memory, but he did not think it was that bad. He believed she understood what she was doing.
Dr. Morin testified:
Q. Doctor, do you have an opinion based on reasonable medical probability as to whether Mrs. Evans on June 23rd, 1989, understood that she was executing legal documents that would change the person that would receive the bulk of her property upon her death?
A. Yes, sir, in my opinion, she knew that.
Q. And, again, the basis for that?
A. Because she's the one unsolicited that mentioned that to me and she gave me the reasons why.
Q. Doctor, do you have an opinion based on reasonable medical probability as to whether Mrs. Evans understood on June 23rd, 1989, that she was executing a new will disposing of her property and changing her beneficiary or recipient?
* * * * * *
A. Yes, sir, she understood it.
Q. Okay. And do you have an opinion based on reasonable medical probability as to whether Mrs. Evans understood on June 23rd, 1989, that she was amending her trust to dispose of her property and changing the trust beneficiary?
* * * * * *
A. Yes, sir, she did.
On cross-examination, Dr. Morin was confronted with four responses by Mrs. Evans which were factually incorrect. She told the doctor that her third husband died at Pearl Harbor when the Japanese attacked. In fact, he died of pneumonia in Honolulu in 1941. She said her mother had died five years earlier; in fact, her mother had been *713 dead for many more years than that. She said she had no living relatives except her niece. Actually, she had two nephews and some grand-nephews as well. Finally, she said her estate was worth about $45,000. That was about right excluding the trust, but with the trust, which was part of her estate, it was worth over $325,000.
Considering these wrong answers, Dr. Morin agreed that, had he known the facts at the time, this would have further downgraded her mental functions. Nevertheless, it remained his firm medical opinion that despite these memory deficienciesto be expected in a 97-year-old personshe understood what she was about to do and its consequences, and was mentally competent to execute the legal documents.
Dr. Morin finally testified that he reviewed the videotape of Mrs. Evans executing the will and trust amendment. The documents were executed in the same office where the mental status medical examination took place a little while earlier. The videotape confirmed his opinion that Mrs. Evans was competent.
The third doctor to testify by deposition was Dr. Robert G. Heath, an expert psychiatrist and neurologist. He testified for Corley. His opinion was that the testatrix was not mentally capable of making a will under Louisiana law.
Entering the case after her death, Dr. Heath never examined Mrs. Evans. He prepared himself for his expert testimony by reading the depositions of some of the witnesses, reading the letters that Mrs. Evans wrote to Corley, and studying the depositions of the other two doctors who had seen her.
Dr. Heath did not credit either Dr. Morin or Dr. Paraguya with having done a thorough mental status examination, but agreed with them that the best bet was she had cerebral arteriosclerosis. Dr. Heath gave no credence to Dr. Morin's opinion as to her mental competency. He blamed Dr. Morin's opinion as being short on data. Based on the responses that Mrs. Evans gave to Dr. Morin's questions, and the mistakes that she made, Dr. Heath believed that she did not know she was making a will, she did not know the nature and extent of her property, and she did not know the natural objects of her bounty.
He also viewed the videotape, and found support from it for his opinion, interpreting certain comments that Mrs. Evans interjected into the proceedings as inappropriate. For example, one time she asked Wadsack if he was Catholic. Another time she called attention to her dress. Looking at the video camera, she asked if she was going to be on television. To Dr. Heath, these inappropriate comments indicated that she did not know what she was doing from one minute to the next.
Dr. Heath based his own opinion on the "critical data" that "we now have from ancillary resources from other reliable informants". His "critical data" was to some extent his own interpretation of the facts as gleaned from depositions that he was given to read. For example, he discussed Mrs. Evans' comment to Dr. Morin that Corley had done something unprincipled, and that that was her reason for changing her will to exclude him. Dr. Heath testified that from what he had read, including the letters, the deceased's thoughts may well have been motivated by undue influence. He criticized Dr. Morin for not pursuing the question of whether Mrs. Evans was unduly influenced by Margaret Fisk Munro. His reasons for criticizing the lack of pursuit of this question were his conclusions that Mrs. Munro was in a position to profit, and that all the evidence, including her own letters, indicated that the deceased did not get along at all with her. While conceding that Corley had some control over Mrs. Evans' money, he insisted "there was no evidence from any source that he abused this." Finally, Dr. Heath felt that Corley was trying to help the deceased and that they were getting along fine.
The data on which Dr. Heath based his opinion did not include the trial testimony of John Wadsack, the testimony of Mrs. Munro and her husband, the testimony of the witnesses to the will, and that of Mrs. Evans' maid. Nor did it include knowledge of the number and frequency of changes Mrs. Evans made in her wills for nearly 20 years, or *714 her propensity for routinely dropping and adding specific legatees.

CONCLUSION
Corley's burden of proof was a heavy one. Mrs. Evans was presumed to have the mental capacity to make a will. To overcome that presumption, Corley's evidence had to be clear and convincing. The trial judge did not believe his evidence was clear and convincing. The trial judge found she was mentally competent. The standard of our review of that finding of fact is clear error. We find no clear error.
The trial judge had all the evidencethe lay testimony, the letters, the wills, the videotape, and the medical depositions. It was his function to make credibility determinations in the lay testimony, and determine the helpfulness of the expert testimony.
The established rule that an expert's opinion is no better than the facts and data on which it is based applies to all the doctors in this case. Dr. Morin may not have had all the data, but neither did Dr. Heath. In the final analysis it was one psychiatrist's opinion against the other's. The trial judge did not err in finding Dr. Morin's opinion reliable.
The great weight of the lay testimony was that Mrs. Evans knew what she was doing. Wadsack was her attorney throughout the eight months of Corley's visit. He saw her and counseled her on numerous occasions, often in Corley's presence. He testified to facts which furnish a reasonable basis for believing that Mrs. Evans formulated her mistrust for Corley on her own.
Her last minute change of mind as to her beneficiary was not out of character, and certainly not evidence that she was incompetent. She had been changing her mind for 20 years. She often found fault with the people closest to her. There is an aphorism that familiarity breeds contempt. Never before in their long relationship had Corley and Mrs. Evans been in each other's company for as long as eight months. Perhaps he fell out of favor because she got to know him too well.
The above comments, of course, are pure speculation. But so is so much else in this complicated and fascinating case. It is good that we have a law that presumes testamentary capacity.
For the foregoing reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[*] Honorable Lucien C. Bertrand, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.