**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**CA 20-192**


**SUCCESSION OF**

**CHARLES R. WESTERCHIL**




\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 43,007
HONORABLE GEORGE CLARENCE METOYER JR, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and D. Kent Savoie,
Judges.


**AFFIRMED.**

William Alan Pesnell
Alan Pesnell Lawyer, LLC
120 E. Mark St.
Marksville, LA 71351
(318) 717-2380
COUNSEL FOR PLAINTFFS/APPELLANTS:
    Jennifer Westerchil
    Lacey Westerchil Fulson
    Paul Westerchil

Jeremy C. Cedars
Fine Legal Services, L.L.C.
4615 Parliament Drive, Ste 202
Alexandria, LA 71303
(318) 767-2226
COUNSEL FOR DEENDANT/APPELLEE:
    Kimberly Westerchil

**SAVOIE, Judge.**

Plaintiffs, who are the adult children of Charles Westerchil ("Chuck"), appeal the trial court's dismissal of their Petition seeking to annul Chuck's Last Will and Testament dated February 26, 2014 ("Testament"), as well as a trust created that same day. Specifically, Plaintiffs challenge the form of the Testament, as well as Chuck's capacity to execute the Testament and Trust. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Chuck and Kimberly ("Kim") Westerchil were married in 1997. Prior thereto, on March 14, 2017, they signed a Matrimonial Agreement stating that, in anticipation of their upcoming marriage, "they desired to contractually modify the regime of property between married persons[,]" such that "all property presently owned or hereinafter acquired by each, in his or her individual name, shall be separate property of that party[.]" The Matrimonial Agreement further provided that "the income of either party whether derived from business, profession, investments, or otherwise, shall be that spouse's separate income and property[,]" and that "to the extent the parties may acquire property jointly, said property shall be considered community property insofar as it is an advantage of the taxpayer for the purposes of computation of taxes due . . . ."

Prior to his marriage to Kim, Chuck had two children with his first wife, as well as an adopted third child. Those children, who are now adults, are Jennifer Westerchil ("Jennifer"), Lacey Westerchil Fulson ("Lacey"), and Paul Westerchil ("Paul"). Kim also had two daughters from a prior relationship, Emily Morgan and Ashley Bowen. Chuck and Kim did not have any children together.

On September 17, 1998, Kim donated to Chuck through a written Act of Donation an undivided one-half interest in property bearing the address of 1805 Yupon Drive, in Alexandria, Louisiana ("Yupon property"). The Act of Donation stated that "they currently reside together as husband and wife; and they have agreed to establish the residence at 1805 Yupon Drive as their matrimonial domicile and have jointly expended sums in renovation of the same." They thereafter resided at this address as husband and wife.

Throughout the marriage, Chuck was the owner of Westerchil Construction Company, and Kim owned a check cashing business. In 2012, however, Chuck was diagnosed with dementia. In late 2012, Kim closed her business and began working with Chuck and Chuck's daughter, Jennifer, at Westerchil Construction.

On July 10, 2013, Chuck signed a Power of Attorney designating Kim to be his "mandatary agent and attorney-in-fact, granting to [her] full authority to act for [him] in conduct of all of [his] affairs."[1]

On February 26, 2014, Chuck signed a Last Will and Testament, which is the Testament at issue herein. The Testament provides for the following bequests:

> 2.1 <u>Kimberly Westerchil.</u> I leave unto Kimberly Westerchil all of my personal effects and household items, including but not limited to my jewelry, clothing, household furniture and furnishings, art and art objects, books, collections, and other tangible articles of a personal nature, or my interest in such property, not otherwise specifically disposed of by this last will and testament.

---

[1] The Power of Attorney provided that the authority granted onto Kim included, but was not limited to, responding to correspondence; depositing and withdrawing funds from financial accounts; endorsing promissory notes and checks; borrowing money on notes or other obligations; buying, accepting, or receiving by donation any type of property rights; selling or encumbering Chuck's property, specifically including all real estate interests owned by him; suing in Chuck's name and on his behalf; representing Chuck judicially or otherwise in all successions or estates in which he is or may become interested; signing and filing tax returns on Chuck's behalf; employing legal or financial assistance on Chuck's behalf; and making healthcare decisions on Chuck's behalf.

2.2     Residuary Estate.  I believe [sic] the balance of my estate to the Westerchil Family Irrevocable Trust, dated Feb. 26, 2014[2], including any amendments thereto.

Also on February 26, 2014, Chuck and Kim established the Westerchil Family Irrevocable Trust ("Trust"), and certain property was transferred to the Trust via an Act of Transfer signed and dated the same date.  This property included the Yupon property, a brokerage account in Kim's name, three financial accounts in Chuck's name, and four tracts of property belonging to Chuck.

The Trust names Kim as the initial Trustee over the Trust's assets, with Chuck's daughter, Jennifer, named as the successor Trustee.  The Trust further provides that Chuck and Kim are "the lifetime income beneficiaries of this Trust[,]" and then further enumerates successor income beneficiaries and principal beneficiaries.  Specifically, Kim's children, Emily Morgan and Ashley Bowen, were named as the "successor income beneficiaries and initial principal beneficiaries" of the Yupon property.  In addition, Chuck's children, Jennifer, Lacey, and Paul, were named as the "successor income beneficiaries and initial principal beneficiaries" of three tracts of land formerly owned by their grandparents.  The Trust further contemplated that Chuck's grandchildren, as well as Kim's grandchildren, were each to receive a principal interest of $10,000.00.  In addition, any future grandchild of either Chuck or Kim was also to receive a principal of interest of $10,000.00.

Chuck subsequently passed away on February 16, 2016.  Thereafter, Kim filed a Petition to probate Chuck's Testament, and she was appointed Executrix of the Succession.

---

[2] The date is handwritten on the Testament.

On August 16, 2017, Chuck's adult children, Jennifer, Lacey, and Paul ("Plaintiffs"), filed a Petition to Annul Probated Testament and Related Matters. Kim was named as Defendant in her capacity as the Executrix of the Succession, the Trustee of the Trust, and individually. In their Petition, Plaintiffs sought to nullify both the Testament and the Trust, alleging that Chuck suffered from dementia and Alzheimer's "for some years prior to his death[,]" and "as a result of the debilitating effects of those diseases and problems[,]" he did not have the requisite mental capacity to execute the Testament or Trust. They further sought to revoke the Testament and Trust because they are "the product of influence by the Executrix that so impaired the volition of the Decedent as to substitute the volition of the Executrix for the volition of the Decedent."

Plaintiffs also noted in their Petition that Chuck's marriage to Kim was governed by the Matrimonial Agreement establishing a separate property regime, and they further alleged that, in accordance with Chuck's prior testament dated July 7, 2000, "the children receive[d] outright bequests, and [Chuck] left certain specific bequests to [Kimberly]." However, according to Plaintiffs' petition, despite the language of the Matrimonial Agreement, the February 2014 Testament and Trust transferred all of Chuck's properties to the benefit of Kim for her life, as well as granted a fifty percent interest to Kim's children, thereby effectively abrogating the matrimonial agreement between the parties.

Following trial on July 9, 2019, the trial court rendered a judgment against Plaintiffs and dismissed their Petition. Plaintiffs appeal and assert the following as assignments of error:

1. The Trial Court erred in failing to annul the testament based on the facial invalidity of the testament and Trust.

4

2. The Trial Court erred in concluding that Appellants had failed to prove by clear and convincing evidence that the Decedent lacked the capacity to execute the testament and the trust at issue in this proceeding.

## ANALYSIS

*Validity of Form*

In their first assignment of error, Plaintiffs argue that because Chuck's otherwise typewritten Testament included dates filled in by hand by the notary, the Testament is not in the form required by La.Civ.Code art. 1577.[3] The trial court's determination as to the validity of a testament's form is a matter of law and subject to de novo review. *Succession of Biscamp*, 16-673 (La.App. 3 Cir. 2/1/17), 211 So.3d 472, *writ denied*, 17-408 (La. 4/27/18), 241 So.3d 305.

Chuck's Testament is a notarial testament contemplated by La.Civ.Code art. 1576. "A notarial testament is one that is executed in accordance with the formalities of Articles 1577 through 1580.1." La.Civ.Code art. 1576. Louisiana Civil Code Article 1577 (emphasis added) provides as follows with respect to the form requirements of notarial testaments:

> **The notarial testament shall be** prepared in writing and **dated** and shall be executed in the following manner. If the testator knows how to sign his name and to read and is physically able to do both, then:
>
> (1) In the presence of a notary and two competent witnesses, the testator shall declare or signify to them that the instrument is his testament and shall sign his name at the end of the testament and on each other separate page.
>
> (2) In the presence of the testator and each other, the notary and the witnesses shall sign the following declaration, or one substantially similar: "In our presence the testator has declared or signified that this instrument is his testament and has signed it at the end and on each other separate page, and in the presence of the testator and each other

---

[3] We note that while Plaintiffs' stated assignment of error challenges the form of both the Testament and Trust, Plaintiffs have failed to brief the form issue with respect to the Trust. Therefore, that issue is deemed abandoned on appeal. Uniform Rules—Courts of Appeal, Rule 2–12.4

5

we have hereunto subscribed our names this _____ day of _____, _____."

"There is a presumption in favor of the validity of testaments in general, and proof of the nonobservance of formalities must be exceptionally compelling to rebut that presumption. *In re Succession of Holbrook*, [13-1181,] p.11 [(La. 1/28/14)], 144 So.3d 545,] at 853." *Successions of Toney*, 16-1534, p. 5 (La. 5/3/17), 226 So.3d 397, 401.

It is undisputed that Chuck's Testament was prepared and notarized by attorney Steve Cook. The Testament is typewritten and contains two pages. The second page contains the following attestation clause:

> The testator has signed this Will at the end and on each other separate page, and has declared or signified in our presence that it is his Last Will and Testament, and in the presence of the Testator and each other, we have here unto subscribed our names on this 26th February, 2014.

Rather than being typewritten, the portion of the clause stating "26th February" was filled in by hand by Mr. Cook. Chuck's handwritten signature, as well as those of two witnesses, and Mr. Cook, as the notary, appear following the attestation clause. Following the signatures is "Alexandria, La., this 26th day of February, 2014" with "26th" and "February" having been filled in by hand by Mr. Cook. Similarly, "Alexandria, La., this 26th day of February, 2014" also appears on the bottom of the first page of the Testament, followed by Chuck's signature, with "26th" and "February" also having been filled in by hand by Mr. Cook.

In addition, the first page of the Testament contains the following clause:

> 2.2. Residuary Estate. I believe [sic] the balance of my estate to the Westerchil Family Irrevocable Trust, stated Feb. 26, 2014, including any amendments thereto.

The underlined portion of this clause stating "Feb. 26, 2014" was also filled in by hand by Mr. Cook.

On appeal, Plaintiffs argue that La.Civ.Code art. 1577 requires that any date element of a notarial testament that is blank must be filled in with the handwriting of the testator; otherwise, according to Plaintiffs, there is "potential for the dating of the instrument on a different date[,]" and the "blank leaves too much room for fraud in the process, especially where it is not filled in with the handwriting of the testator." We first note, however, Plaintiffs have not suggested that the date of the Testament was incorrect or fraudulent.

The Louisiana Supreme Court has stated as follows with respect to the date requirement for a notarial testament:

> Although Art. 1577 . . . mandates the will be dated, it does not specify the location in the testament where the date must appear. Indeed, Comment (g) to La. Civ.Code art. 1577 specifically addresses the issue of the date and its location:
>
>> This Article requires that the testament be dated but intentionally does not specify where the date must appear, nor does it require that the dating be executed in the presence of the notary and witnesses or that the dating be made by the testator. It is common practice to have a typewritten testament that is already dated, and that testament should be upheld if it is valid in all other respects. The first paragraph of the Article states that "the testament shall be prepared in writing and shall be dated", and the subsequent language (with reference to execution) intentionally contains no language that refers to the dating having been executed in the presence of the witnesses or the notary. **Nor is there any requirement that the testator be the one to date the testament**. **The critical function of the date is to establish a time frame so that, among other things, in the event of a conflict between two presumptively valid testaments, the later one prevails.**

*In re Succession of Holbrook,* 144 So.3d at 850 (emphasis added).

Therefore, in light of *In re Succession of Holbrook,* and La.Civ.Code art. 1577, Official Revision Comments (g), we reject Plaintiffs' argument that La.Civ.Code art. 1577 requires that the date of the notarial testament be filled in by hand by the

7

testator if it has not otherwise been typewritten, when no such requirement exists in the language of the article. Rather, the Testament at issue is properly dated in writing in accordance with the La.Civ.Code art. 1577.

*Mental Capacity*

In their second assignment of error, Plaintiffs argue that the Testament and Trust should have been declared null because they sufficiently established that Chuck lacked the requisite capacity when executing these documents. Specially, they focus on Chuck's diagnosis of Alzheimer's dementia.

"To have capacity to make a donation *inter vivos* or *mortis causa,* a person must also be able to comprehend generally the nature and consequences of the disposition that he is making." La.Civ.Code art. 1477. "Capacity to donate mortis causa must exist at the time the testator executes the testament." La.Civ.Code art. 1471. "'A party is presumed to have testamentary capacity, and the opponent bears the burden of defeating this presumption by putting forth clear and convincing evidence to the contrary.'" *In re Succession of Sandifer*, 05-860, p. 3 (La.App. 3 Cir. 3/1/06), 923 So.2d 862, 864 (quoting *Succession of Fletcher*, 94-1426, p. 4 (La.App. 3 Cir. 4/5/95), 653 So.2d 119, 121, *writ denied*, 95-1105 (La. 6/16/95), 655 So.2d 338). "In determining mental capacity, the question presented is whether the testator, at the time of the execution of the will, understood the nature of the testamentary act and appreciated its effects." *Naquin v. Hile*, 536 So.2d 676, 681 (La.App. 3 Cir. 1988).

> Concerning the role of medical evidence in suits challenging the validity of a will, the court stated in *Succession of Braud*, 94-668, p. 5 (La.App. 4 Cir. 11/17/94), 646 So.2d 1168, 1171, *writ denied*, 95-383 (La. 3/30/95), 651 So.2d 841:
>
>> The caselaw is clear that proof of the presence of a mentally-debilitating condition at the approximate time

that the will was executed is insufficient to prove lack of testamentary capacity at the time the will was executed by clear and convincing evidence, especially in light of conflicting evidence of the decedent's capacity at the actual time the will was executed. Even the fact that the decedent had previously been interdicted was insufficient to prove lack of testamentary capacity in [*Succession of*] *Cole*, 618 So.2d 554 [(La.App. 4 Cir.1993)].

*In re Succession of Polk*, 06-366, pp. 5-6 (La.App. 3 Cir. 9/27/06), 940 So.2d 895, 899 (alterations in original).

"The determination of testamentary capacity is a question of fact upon which the trial judge's findings will not be disturbed unless clearly wrong." *Corley v. Munro*, 93-713 (La.App. 3 Cir. 2/2/94), 631 So.2d 708, 709 (quoting *Succession of Hamiter*, 519 So.2d 341 (La.App. 2 Cir.), *writ denied*, 521 So.2d 1170 (La.1988)).

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. . . .

When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell v. Esco*, 549 So.2d 840, 844-45 (La.1989) (internal citations omitted).

In the instant case, the Testament and Trust were prepared by attorney Steve Cook. Mr. Cook testified at trial that he has been practicing law for thirty-eight years, and that he has prepared approximately four hundred to five hundred wills and thirty to forty trusts. He further testified that Kim initially contacted him about

meeting with her and Chuck to prepare their wills and trust. He indicated that he first met with Chuck and Kim in September of 2013 to discuss how they wanted things structured, who they wanted to leave their property to, and the various terms of the documents. He stated that he then met with Kim and Chuck three or four more times over the next several months at Westerchil Construction Company. According to Mr. Cook, Chuck verbally communicated his desires to him regarding the Testament and Trust. He then prepared and provided various drafts of the documents to Chuck to read and review, and during the meetings, they would discuss various particulars, terms, and changes to the drafts. Mr. Cook testified that he would hand the documents to Chuck for him to read, and he assumed Chuck was reading them to himself. Mr. Cook stated that Chuck "was quiet, he looked at the document, he turned the page just as Kim did, they both read the documents, there may have been some corrections to make."

When asked whether others were present at any of the meetings that took place at Westerchil Construction, Mr. Cook indicated that on a couple of occasions, Jennifer, as well as a Westerchil Construction employee, Michelle Roberts, were present in the building, but he could not remember whether they were in the room during any discussions pertaining to the particulars of the documents.

However, Jennifer testified that she did attend one meeting with Chuck, Kim, and Mr. Cook, regarding the Testament and Trust, but she did not think Michelle was present during the meeting. According to Jennifer, the meeting lasted about fifteen minutes. Jennifer explained that she became aware of the Testament about a month before it was completed, and that Michelle had told her it may be in her best interest to sit in on a meeting. She testified that during the meeting, Mr. Cook gave her and Kim a copy of the proposed documents, but that he did not give one to Chuck.

10

Jennifer testified that Mr. Cook did not speak to Chuck about what was in the draft, and that he did not speak to her either. Rather, everyone just read the documents, and questions were addressed to Kim. Jennifer also testified that, during the meeting, she was almost positive that Chuck was playing with a stray dog who frequented the office. Jennifer was not, however, present during the signing of the documents on February 26, 2014.

Mr. Cook testified that the Testament and Trust, as well as Kim's last will and testament, were executed at his office on February 26, 2014. He stated that Kim, Chuck, and Michelle came together to his office. Mr. Cook stated that he did not have any specific recollection of this particular signing, but that his customary practice was to have the parties read the documents, ask if they have any questions, and then ask whether they are ready to sign. Then, once they are ready to sign, he brings in witnesses, and asks the parties in front of the witnesses whether they have read the documents and whether they declare that this is their last will. Once that declaration is made, the documents are signed, and he points to the places where signatures are needed.

Mr. Cook testified that at some point prior to drafting the documents at issue, he was made aware that Chuck had been diagnosed with dementia, but he did not otherwise inquire as to any medications Chuck was taking the day of the signing. He further indicated that at some point he became aware that Chuck was attending Friendship House, an adult daycare facility that provides services to dementia patients, but he could not remember whether that was before or after Chuck signed the documents.

Mr. Cook further testified that, on the day of the signing, Chuck and Kim "both appeared to be fine. I did ask them if they had read it, and I did ask them if

they declared that it was their last will and testament, and they answered in the affirmative to both questions." Then, according to Mr. Cook, they both signed the documents separately, along with two witnesses, including Michelle, and Mr. Cook as the notary. Mr. Cook further testified that he "was not under the impression that Chuck was belaboring with any sort of serious mental disability at the time[,]" he never thought at any time that Chuck was incapacitated, and if any such concern had arisen, he "would have told Kim that she needed to do an interdiction and that [he] couldn't do anything else for her[.]" Mr. Cook further indicated at trial that, at the time Chuck signed the documents, he did not observe anything indicating that Chuck "was not in his right mind" or that he did not understand what he was doing when he signed the documents.

Kim also testified at trial regarding her and Chuck's meetings with Mr. Cook and the date of signing. She explained that during the meetings at Westerchil Construction, "Chuck was very capable of communicating," and communicated directly with Mr. Cook regarding what he wanted in terms of the Testament and Trust. Kim indicated that they met three or four times with Mr. Cook, and Jennifer was present at one of the later meetings, to "bring her up to speed" on what they were doing. She explained that she, Chuck, Mr. Cook, Jennifer, and Michelle were present at the meeting, and that Michelle was there to take minutes. According to Kim, during this meeting, Chuck communicated directly with Mr. Cook, Mr. Cook gave them copies of the documents, they read them together more than once, with her reading her testament and Chuck reading his. Kim further testified that on February 26, 2014, when the Testament and Trust were executed, she and Chuck read the documents to themselves, but that they had gone through details prior to

12

that day. She stated that the purpose of the meeting was strictly to sign the documents.

Lisa Elbrow, who signed as a witness to the Testament and Trust, also testified at trial. She indicated that she was a paralegal for another attorney who worked in the same building as Mr. Cook, and Mr. Cook would ask her to witness the signing of documents. Ms. Elbrow testified that while she did not have any specific recollection of the execution of Chuck's Testament and Trust, it was Mr. Cook's practice to have the testator formally declare to everyone in the room that it was his will, prior to signing, but that it was not Mr. Cook's practice to have the testator read the will in front of the witnesses or for Mr. Cook to read the testament out loud in front of the witnesses. Ms. Elbrow further stated that she watched Chuck sign his Testament, as well as Chuck and Kim sign the Trust and related documents. She further indicated that there was nothing unusual that happened during this particular signing "because I don't recall anything about it."

It is undisputed that Chuck was diagnosed with dementia in 2012. At trial, the parties submitted the depositions and medical records of Chuck's treating physicians, Dr. Michael Screpetis, a family practitioner, and Dr. Edwin Urbi, a psychiatrist.

Dr. Urbi first started treating Chuck on April 17, 2012. He testified that Chuck's primary complaint that day was memory loss and forgetfulness. He further testified that Chuck "was not able to cooperate" with the administration of Mini-Mental State Examination, which tests the level of a patient's dementia. According to Dr. Urbi, Chuck was "not either ready to cooperate or unable to fully the answer the questions." Dr. Urbi's medical record from that date further indicated that

Chuck's cognitive functioning was "fair," and that his insight and judgment were "good[,]" and Chuck was prescribed Cerefolin and Aricept.

Dr. Urbi saw Chuck again on May 8, 2012, at which time he was diagnosed with dementia. On June 5, 2012, Dr. Urbi reported that Chuck had a slow, progressive decline in memory, but a decrease in stress. On August 2, 2012, Dr. Urbi noted he saw and evaluated Chuck, Aricept was helping Chuck with his memory, and he diagnosed Chuck with Alzheimer's dementia. Dr. Urbi explained during his deposition that dementia is the "umbrella diagnosis" with Alzheimer's being one of the most common causes of dementia. Dr. Urbi saw Chuck again on October 25, 2012, and he noted that Chuck had missed his medications for several days. Chuck's Aricept dosage was increased, he was prescribed an antidepressant, and he was to continue therapy.

On July 30, 2013, Dr. Urbi noted that Chuck was experiencing side effects from Aricept; therefore, that was discontinued, and Chuck was prescribed Exelon, which is another medication for dementia. Chuck saw Dr. Urbi again on October 22, 2013.

Chuck's next visit with Dr. Urbi was on January 21, 2014, which was about a month before he executed the Testament and Trust. During his deposition, Dr. Urbi read his notes from that visit, stating "seen and evaluate patient, reports patient attending Friendship House . . . three or four times a week. . . . patient with cognitive deficits, patient able to cope with routine, no med side effects, no depression, no agitation . . . and the plan was to continue medicine, provide supportive care and . . . return to clinic in 6 months." Dr. Urbi further explained:

> Friendship House is a day program that provides care to patients who not only have psychiatric emotional [needs] but need[] some day care assistance. . . . It provides patient[s] time to interact with other people

14

in a controlled type of environment. It's not really a medical hospital setting but it's more like a day care. They have activities, they have people who teach[] them to do certain things, and so it's a good support for them.

Dr. Urbi testified that, based on his note from January 2014, it was his opinion that Chuck was stable at this time, and that he "pushed the follow up at 6 months because I feel that we we're [sic] really at some plateau, some stability."

Chuck's next evaluation with Dr. Urbi was July 29, 2014, which was five months after Chuck executed the Testament. Dr. Urbi testified that there was no indication in his records that he had received any calls from Chuck or Kim between January 2014 and July 29, 2014 suggesting that there were any significant issues during that time. However, Dr. Urbi reported that on July 29, 2014, Chuck was

> starting to hallucinate, visualizing people in home, conversation with self, incident during Father's day[,] patient got upset with altercation between son and daughter, primary care physician Dr. Screpetis did work up, normal as per wife, started Klonopin as needed from primary physician that's Dr. Screpetis, with some response, no agitation, not suicidal or homicidal . . . . So diagnosis is . . . dementia and psychosis. So, I went up on the Exelon.

In September 2014, Chuck was having seizures and was hospitalized. On September 11, 2014, Dr. Urbi's notes reflect he spoke with Kim, who indicated that Chuck "has been having seizures, agitation, was crying all the time, angry all the time . . . . So, I referred him to the hospital." Dr. Urbi saw Chuck again on October 9, 2014, at which time he noted that Chuck had recently been discharged from Ocean's Behavioral Hospital, and that he was now in an assisted living program called Brookdale.

When asked whether Chuck had the capacity to execute a Testament on February 26, 2014, Dr. Urbi testified he could not state one way or another. He stated that he never performed a capacity evaluation for Chuck, explaining that the

15

purpose of his patient examinations was to monitor the progression or regression of the disease, and then assess for safety issues such as whether a patient was safe to be at home. Dr. Urbi testified that that during his course of treatment of Chuck, he never came to an opinion that Chuck should not be making financial or business decisions. Dr. Urbi further stated that, based upon his records, he could not make a determination as to whether Chuck had capacity to execute the Testament on February 26, 2014. He explained that in order to evaluate capacity,

> I don't think necessarily [I have to be] in the room that same day but, for me to do a capacity [evaluation] I have to ask them specific medical, legal type questions and I need to know the answers to specific questions. And I never had that intention to do a capacity evaluation on him. And there was no request, there was no indication, as far as I'm concerned, and I didn't even know there was a will that was filed during that time."

Dr. Urbi also indicated that there was no record of him suggesting the initiation of an interdiction process for Chuck, or that any such request was made by a family member.

Chuck's family practitioner, Dr. Screpetis also testified that there was nothing in his medical records that would give him an indication, one way or the other, regarding Chuck's competency on February 26, 2014. He explained that Alzheimer's patients have good days and bad days and without having actually seen him that day, he does not know whether February 26, 2014, was a good or bad day.

At trial, Chuck's records from Friendship House were admitted into evidence, and testimony was elicited from Laurie Paul, the activities director at Friendship House. Chuck began attending Friendship House in October 2013, and was discharged in September 2014, when he was admitted to Ocean's Behavioral Hospital, and then to an assisted living facility.

16

Ms. Paul's progress notes from November 6, 2013, through March 12, 2014, generally reflect that Chuck interacted well with the staff and other patients, he played games, but needed assistance with BINGO, he exercised, and he attended devotionals. There was nothing in her notes regarding Chuck's cognitive abilities. Ms. Paul's notes during this timeframe further state that Chuck would read at different times; however, she stated at trial Chuck was not actually reading, but rather just looking at pictures.

The Quarterly Staffing Notes in the Friendship House records from January 10, 2014, reflect an improvement in Chuck's physical, cognitive, and social abilities. Similarly, a Nursing Assessment dated January 13, 2014, noted a slight improvement in cognitive, social, and physical abilities. However, on February 24, 2014, a Nursing Progress Note stated that Chuck was attending Friendship House three to four days a week, and "[a]lthough confused, he interacts well with staff and participates in group activities. Noted decline in cognitive abilities."

The Quarterly Staffing Note in the Friendship House records dated April 10, 2014, also reflect a decline in cognitive abilities, but stated physical and social abilities remained good. On May 9, 2014, Ms. Paul's progress note stated Chuck was unable to follow directions, was more confused, and liked to read and watch television. Then, on July 10, 2014, the Quarterly Staffing Note stated that Chuck was open to communicating feelings and emotions, there was a slight improvement in socialization, his cognitive skills varied in ability, and he showed slight improvement in memory. However, a nursing assessment on July 16, 2014, noted a decline in cognitive abilities.

Jennifer also testified at trial. She explained that she worked with Chuck at Westerchil Construction, and the plans were for her to eventually take over her

17

father's business. They would review project plans, specifications, and blueprints daily, and she stated that Chuck was an avid reader.

Jennifer stated that, in 2012, she knew Chuck was diagnosed with dementia. Jennifer testified that toward the end of 2012, he started wandering around the office, and she noticed his lack of involvement in project plans and specifications. Jennifer explained that Kim would help with the paperwork and bookkeeping, but did not otherwise have a specific job title.

Jennifer further indicated that in early to mid 2013, she realized that Chuck was no longer able to mentally comprehend construction plans and specifications, and that his whole demeanor became disconnected and he seemed lost. According to Jennifer, her conversations with Chuck became disconnected and meaningless, he could not complete sentences or stories, and his fine motor skills were declining. Jennifer also testified that in late 2013, Chuck no longer thought for himself and Kim had stepped in, and that by mid to late 2014, Chuck did not talk at all. Rather, he would just smile, giggle, and say "yes" to anything that was suggested.

Chuck's son, Paul, also testified at trial. He stated that in 2012 and 2013, Chuck could not put together full sentences, would jumble his words, and lose his train of thought.

"Our courts have determined that given the presumption in favor of capacity, opponents to a will failed to meet the clear and convincing standard, where a testator suffered from moderate Alzheimer's disease and there was conflicting testimony about [his or] her capacity." *In re Succession of Culotta*, 04-1298, p. 12 (La.App. 5 Cir. 3/1/05), 900 So.2d 137, 143, *writ denied*, 05-817 (La. 5/13/05), 902 So.2d 1024.

In *Succession of Braud*, 94-668 (La.App. 4 Cir. 11/17/94), 646 So.2d 1168, *writ denied*, 95-383 (La. 3/30/95), 651 So.2d 841, the trial court's determination that

18

Plaintiff failed to establish the testator lacked testamentary capacity was affirmed despite the testator's diagnoses of dementia, organic brain involvement, brain atrophy, metastatic brain disease, and depression. The court concluded that the evidence was:

> insufficient to meet [Plaintiff's] burden of proving lack of testamentary capacity with clear and convincing evidence, principally because it "does not contain anything to establish mental incompetency when the decedent executed her will." [*Succession of*] *Mack*, 535 So.2d [461,] at 463 [(La.App. 4 Cir. 1988)]. The only witnesses present when the will was actually executed all testified unequivocally that Ms. Braud did have the necessary mental capacity to execute the will on the day the will was actually prepared. None of [Plaintiff's] evidence rebuts this testimony. The caselaw is clear that proof of the presence of a mentally-debilitating condition at the approximate time that the will was executed is insufficient to prove lack of testamentary capacity at the time the will was executed by clear and convincing evidence, especially in light of conflicting evidence of the decedent's capacity at the actual time the will was executed. Even the fact that the decedent had previously been interdicted was insufficient to prove lack of testamentary capacity in [*Succession of*] *Cole*, 618 So.2d 554 [(La.App. 4 Cir. 1993].

*Succession of Braud*, *Id.* at 1171.

In the instant case, while the evidence was undisputed that Chuck was suffering from some form of Alzheimer's dementia at the time he executed the Testament, the testimony from the witnesses who were present at the time Chuck signed the Testament indicate to us that Chuck had affirmed he was signing his last will and testament, and, at the time, appeared to understand what he was signing. Moreover, there was no medical evidence establishing that Chuck lacked the requisite capacity at the time he executed his Testament and Trust on February 26, 2014. Therefore, we find no manifest error in the trial court's conclusion that Plaintiffs failed to prove a lack of testamentary capacity by clear and convincing evidence.

## DECREE

For the reasons set forth above, the trial court's judgment dismissing Plaintiffs' claims is affirmed. Costs of this appeal are assessed to Plaintiffs, Jennifer Westerchil, Lacey Westerchil Fulson, and Paul Westerchil.

**AFFIRMED.**