(43 South. 281.)

No. 16,324.

WOOD et al. v. SALTER.

(March 4, 1907.)

Wills—Testamentary Capacity—Evidence.

Where a will is attacked on the ground that the testator was of unsound mind when he made it, the question which arises is whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish or will of the testator, unbiased by any delusion which may be the result of such disease. The law fixes the time for the application of this test at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even to complete dementia, to make a will in lucid intervals. When the will is established to have been made by the testator himself, unaided by others, and when its provisions and expressions are sage and judicious, containing nothing "sounding to folly," these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 66–68, 103–109.]

(Syllabus by the Court.)

Appeal from First Judicial District Court. Parish of Caddo; Thomas Fletcher Bell, Judge.

Action by T. J. Wood and others against Exa Salter. Judgment for defendant, and plaintiffs appeal. Affirmed.

Fullilove & Mills, for appellants. Hall & Jack, for appellee.

PROVOSTY, J. The will of Walter H. Wood is sought to be set aside in this case, on the ground that the testator was of unsound mind when he made it.

The law of cases of this kind is so satisfactorily stated in Kingsburg v. Whitaker, 32 La. Ann. 1055, 36 Am. Rep. 278, that all that need be done is to transcribe here an extract from that decision:

"The real question is whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish or will of the testator, unbiased by any delusion which may be the result of such disease. The law fixes the time for the application of this test at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even to complete dementia, to make a will in lucid intervals. When the will

is established to have been made by the testator himself, unaided by others, and when its provisions and expressions are sage and judicious, containing nothing "sounding to folly," these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made."

The will itself in the instant case carries no evidence of insanity. It is olographic in form, and reads like any ordinary will.

However the presumption which arises in favor of a will from the absence from it of anything "sounding to folly" is much weakened in this case by the fact that the testator is shown to have made it by copying a form furnished him by a lawyer, his own work having consisted simply in the copying, and in filling the blank left for the name of the legatee and signing; and that he thus had recourse to a form after an unsuccessful attempt to write the will without such aid.

He did, however, add at the foot of the will the names of several persons who were familiar with, and could prove, his signature, as he had been advised to do by the lawyer; which would go to show that he was capable of understanding the situation and acting with steadiness of purpose. Indeed, the very fact of his going to a lawyer for a form shows judgment and deliberation.

The only relatives of the testator were a sister, living in New York, and a brother, living in Shreveport. So far as the record shows, they paid no attention to him, and left him to shift for himself. His sister, it seems, would not even answer his letters. His brother seems to have been a drinking man, and of not much account, so much so that he preferred that this brother should not come about him.

On the other hand, the defendant had been kind to the testator and gained his good will and affection. At the time of the execution of the will she was the librarian of the Public Library of Shreveport and he the janitor. They were thus together for seven or eight months. She was then unmarried. Defendant testifies that after she left Shreveport he kept up a correspondence with her, and that his letters were sensible and interesting. She says that she destroyed the letters; but she produces the following postal card, written a few months before his death, and four years after the execution of the will, which is very far from showing insanity, and is conclusive proof of the persistence of his affection for her:

"General Delivery, Shreveport, La.,
"October 31st, 1905.
"Dear Miss Exa: I am coming to see Mr. Salter you and the sweet little boy. Mr. Avery the Station Master here tells me I can get a round trip ticket for Sixteen Dollars to Montgomery. Lookout for me.
"Yours Respectfully,          W. H. Wood."

For over 20 years Wood was what might be called a character about the streets and public buildings of Shreveport. He perished in a fire which consumed the City Hall, in which building he was allowed, as a matter of charity, to occupy a room rent free. This was more than four years after he had made the will. He was at the time of his death 45 years old. His appearance is described by Mr. John R. Land as follows:

"He was below the average height. Had what I would call an abnormally large head for the size of his body. His eyes were either blue or gray, and large, protruding. He wore long beard, and his walk was what I would call a fast shuffling walk, so peculiar that it attracted the attention of every one. He usually walked with a cane, threw his head in the air, turned his face towards the sky, with his hat on the back of his head, and would go down the street whistling."

Other witnesses speak of his wearing a loud vest and flaming necktie, and dyeing his beard, and of his habit of twirling his cane and whistling all the time as he walked along.

Wood was of weak intelligence, but not so much so as to be incapable of understanding

the ordinary affairs of life; and while at times he would talk disconnectedly and act like a crazy man, at other times he could be as sensible and sane as any one.

Dr. Blanchard, president of the Shreveport board of health, who, while declining to pose as an expert, says that he has had some experience with the insane, and who knew Wood well, says he was mentally deficient; that the development of the higher intelligence must have been arrested in childhood, doubtless as the result of some blow; and that his peculiar shuffling walk was due to injury to the cerebellum. That one has no idea how many inmates of insane asylums have the same shambling gait.

The weakness of his intelligence is attested by the fact that the highest employment he seems to have attained, apart from occasionally serving legal notices for the judge of the city court, and the only steady work he seems to have ever done, was as porter or janitor of the Public Library, at a salary of $6 per month and the use of a room to sleep in. This position he filled satisfactorily, and, as we understand, for a space of five years.

His intellectual deficiency is further attested by the fact that he seems to have been an object of charity. He was allowed to occupy rent free a room in the City Hall, and Mayor McKellar speaks of having given him clothes, and of having taken care of his property and collected his rents and turned them over to the person who furnished him his meals. Miss Bellieu, successor to the defendant as librarian of the Public Library, is also shown to have given him a suit of clothes. To the end of his life he was unable to protect himself against the small boys, who, attracted by his eccentric appearance and ways, would follow him in the streets, and even surround him in the Public Library, and worry and tease him, calling him "Emma" for the fun of seeing him made

furious by it. And even a good many grown men could not resist the temptation of making him their laughingstock. Like the small boys, they would call him "Emma" to enjoy the effect it had upon him. His explanation of the effect this name had upon him was that he had loved a young lady by that name.

Of his serious mental derangement the record leaves no doubt whatever. Many things he said and did were unquestionably the promptings of insanity. In December, 1893, he wanted to kill a man who, he thought, had called out "Emma" to him. This led to his being sent to the Insane Asylum at the instance of the district attorney. Within four months he was released, with a certificate that he had been restored to a normal mental condition; but, as a matter of fact, he had not. From that time to the time of his death he entertained the crazy notion that the Freemasons had had him sent to the asylum, and he harbored for them a bitter, violent hatred. He conceived the notion, also, that the soundings of the gongs of the street cars were some mysterious sign or knocks of the Freemasons, and imagined that every car that sounded its gong was doing it at him, and it made him angry. As he walked in the street he would either be whistling or talking to himself or muttering curses. He imagined that people on the other side of the street or in the houses were talking at him or cursing him. At times as he shuffled along he would suddenly, without apparent reason, break into a laugh, or run about 20 steps, and as suddenly stop. He would be friendly with a man, and the next minute would be violently angry with him, and curse him for everything he could think of. He would ask the policemen for a dime, and it would be given him. The policemen testify to having gone several times to his room at night to quiet him by reassuring him against imaginary foes. He would sit all day by the stove in the comptroller's of-

fice, never getting up except to go to his dinner, when he would "jump up, halloo, and run out." "One day Woods came into the saloon and walked up to the counter to get something, got a drink, and dropped a powder or something into the drink, and he dropped on the floor. The bartender remarked that that was his trick." "One day," relates the same witness, "Wood was sitting there just laughing; did that several times; and I says: 'What are you laughing at?' and he began telling me that he was just imagining he had a hose and was throwing hot water on McKellar." McKellar was the mayor. People whom he insulted by his gratuitous curses and abuse did not resent it, holding him irresponsible.

But while at times Wood acted thus insanely he would at other times be entirely rational, and there can be no doubt that he was not as crazy as he looked, or as a great many people on casual observation took him to be. Several witnesses who knew him well, and had ample opportunities for observing him, never detected in him anything abnormal except his habit of whistling, and his peculiar appearance. Dr. Blanchard had taken him to be a fool, but revised his opinion after he had had occasion to converse with him, when he found that he could talk as sensibly as anybody.

Dr. Blanchard and Dr. Alexander had the same experience with him. The first time he came for medical advice they took him for a pauper and told him he owed nothing, but he answered he did not see it that way, and insisted on paying the regular fee; and as often as he came would fix a future day for payment of the fee and faithfully keep the appointment.

Dr. Blanchard, among others, testifies that he was entirely capable of taking care of his affairs, making contracts, etc. And the fact remains that the little he inherited he kept, and administered and enjoyed, and disposed by his testament, in an entirely rational manner. At the time of his death he had made an advantageous 20-year lease of his little property (the property now in suit), consisting of a lot of ground with two cabins on it.

There can be no doubt that this testament was his deliberate act. Between it and his mental derangement no connection is shown. For all that appears, he would have made precisely the same will if his mind had never been touched by insanity. When Mr. McKellar had been kind to him, he had offered to make his will in his favor. His continued affection for the defendant, and his not making another will during the more than four years which he lived after making this one, shows constancy of purpose.

Our learned brother of the district court, who, doubtless, knew Wood, and had had opportunities of personally observing him, sustained the will. We find no sufficient reason for a different conclusion.

Judgment affirmed.

BREAUX, C. J. I concur in the decree.