BRUNOT, Justice.
 

 Miss Catherine Lambert died testate, leaving a number of collateral relatives, and real estate and personal property, which was inventoried and appraised gt a total value of $10,657.91. The will is in the olographic form and is in the following words:
 

 “New Orleans La.
 

 “June 17th 1931
 

 “I will and bequeath to my neice Mrs. S. M. Hussey all real and Personal Property I may Possess at the time of my Death and appoint Mrs. S. M. Hussey executrix without bond.
 

 “Miss Catharine Lambert.”
 

 Miss Lambert died in the city of New Orleans on November 21, 1934. A search for the will of the deceased was applied for and ordered by the court on November 22, 1934, and the will was found in the bank box of the deceased in the Dryades Market Branch of the National Bank of Commerce of New Orleans and presented to the court for probate.
 

 A number of the collateral heirs of the deceased intervened in the proceedings and opposed the probate of the will upon .two grounds viz.: First; illiteracy of the testatrix and her inability to write any thing more than her signature. Second, mental incapacity to make a donation inter vivos or mortis causa. These two issues present questions of fact, and the record is made up of oral testimony, documentary evidence, and photostats, offered by the proponent and opponents of the will. The trial judge resolved the facts in favor of the proponent of the will and dismissed the opposition to the probate thereof. From this judgment the opponents have appealed.
 

 We approach the consideration of the issues here presented impressed with two facts, viz.: First, that wills are presumed to be valid until the contrary is shown. Second, that the trial judge’s finding of facts is entitled to great weight. In the reasons assigned by the trial judge in this case, the proof adduced is not reviewed, but it evidently convinced the judge of the accuracy of his conclusions, for he says:
 

 “I have carefully examined the handwriting of the will, the probate of which is
 
 *419
 
 contested in this case. It is my firm conviction that it was written, dated and signed- by the testatrix herself. There has been no evidence introduced in this case which would lead me to believe that the testatrix was mentally unable to make a will. The bequest which she made in the will to her niece, Mrs. Hussey, is entirely reasonable and seems to me to be in accord with good conscience.” Trans, p. 41.
 

 We have carefully considered all of the evidence in the record and have given especial attention to a comparison of the signature to the will with the admitted signatures of the deceased appearing on the checks, leases, and various other documents offered in evidence. We have also compared the writing of the date and body of the will with the signature to the will, and we find that the will is entirely -written, dated and signed in the same handwriting, i. e., by the same person.
 

 There is testimony pro and con as to-Miss Lambert’s ability to write anything more than her signature. On this point, the substance of the testimony offered by the opponents of the probate of the will is that, other than the will itself and the signature of Miss Lambert to various checks, leases, powers of attorney, etc., no manuscript, of any kind, purporting to have been written by Miss Lambert, is to be found in the record. The opposing collateral re-'’ lations also testify that Miss Lambert' could not write anything except her signature, but not one of them testified that the will offered for probate was not written, dated, and signed by her. On the other hand, the proponent of the will offered, as> witnesses, four adults, three of whom were relatives, with whom Miss Lambert was residing prior to and at the time of her death. All of these witnesses testified that they were familiar with Miss Lambert’s handwriting and that the will offered for probate was entirely written, dated, and signed by Miss Lambert. A fifth witness, Mr. Alexander J. Parlongue, manager of the Dryades Market Branch of the National Bank of Commerce, in which bank Miss Lambert kept her deposits and bank box, testified that he was familiar with Miss Lambert’s signature, and that the signature to the will was her signature. We have stated, supra, that the signature to the will and the date and body thereof were in the same handwriting and were written by one and the same person.
 

 We are impressed by the fact that Miss Lambert rarely signed her name otherwise than
 
 “Kate Lambert
 
 ," but when she did she invariably used an
 
 "a”
 
 rather than an
 
 “e”
 
 in her Christian name, as follows: “Catharine.”
 

 With reference to the pleaded insanity, or mental incapacity of Miss Lambert to legally dispose of, her estate, the record shows that the opponents of the probate of the will took but little interest in Miss Lambert during the latter years of her life, and their knowledge of her mental status is based entirely upon certain detailed eccentricities, such as failure to recognize certain collateral relatives that she had not seen for some time, and, on one occasion, weeping at and leaving the wake of a deceased relative, and entering the home of a .nearby neighbor, where she was later found
 
 *421
 
 after a search was made for her whereabouts.
 

 It is also shown that Miss Lambert was' an old lady, and that a predeceased ancestor of Miss Lambert, and an aged connec-'; tion of the Lambert family, were insane] for an indefinite time before they died.1 From this premise counsel argue that insanity was hereditary in Miss Lambert’s family; but there is no direct proof in the record that Miss Lambert was insane when the will was .written, or at any time during the 82 years of her life. In Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278, this court said:
 

 “The real question is, whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish or will of the testator, unbiased by any delusion which may be the result of such disease. . The law fixes the time for the application of this test, at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even to complete dementia, to make a will in lucid intervals. When the will is established to have been made by the testator himself, unaided by others, and when its provisions and expressions are sage and judicious containing nothing ‘sounding to folly,’ these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made.”
 

 The Kingsbury-Whitaker Case is affirmed in Wood v. Salter, 118 La. 695, 43 So. 281. Testamentary capacity to make a will is presumed even though it be denied by those attacking the validity of the will. Wilcox v. City of Hammond, 163 La. 489, 112 So. 375; Succession of Mithoff, 168 La. 624, 122 So. 886. In the Succession of Mithoff, this court said (quoting from the syllabus) :
 

 “Testamentary capacity is presumed until such presumption is destroyed by cogent, satisfactory, and convincing evidence.”
 

 From the opinion we learn that Mrs. Mithoff was old and in her dotage at the time she made her will; she was suffering from senile dementia, which had developed to some extent, at that time, and she was a paralytic for several years prior to her death. In maintaining the testatrix’ will this court said:
 

 “The degree of proof required to overcome the presumption of sanity and of mental disposing capacity may be likened to that required in criminal cases to rebut and overcome the presumption of innocence which the law creates in favor of a person on trial for a crime. This is, we think, a settled rule of which there can be no doubt.”
 

 With respect to the validity of a will made by an insane person during a lucid interval, we cite Succession of Crouzeilles, 106 La. 442, 31 So. 64; Succession of Ford,
 
 *423
 
 151 La. 571, 92 So. 61; Succession of Bey, 46 La.Ann. 773, 15 So. 297, 24 L.R.A. 577.
 

 In Succession of Connor, 165 La. 890, 116 So. 223, 224, this court said:
 

 “We are not prepared to hold that even a formal interdiction deprives the person interdicted ipso facto of all power to make, alter, or revoke a will, even during a lucid interval.”
 

 For the reasons stated, and upon the authorities cited, we find that the judgment appealed from is correct, and it is affirmed, at appellants’ cost.
 

 O’NIELL, C. J., absent.