# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-366

## SUCCESSION OF JULIETTE BIJOU POLK

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT,
PARISH OF IBERIA, NO. 18422-G,
HONORABLE CHARLES PORTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## MICHAEL G. SULLIVAN
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

**AFFIRMED.**

**Carl A. Perkins**
**Attorney at Law**
**728 N. Theard Street**
**Covington, Louisiana  70433**
**(985) 892-8158**
**Counsel for Appellant:**
**Earline York**

**Stephen F. Mestayer**
**Attorney at Law**
**Post Office Box 12340**
**New Iberia, Louisiana  70562-2340**
**(337) 365-8181**
**Counsel for Appellee:**
**Zerita Polk Depass**

**James W. Schwing, Sr.**
**Attorney at Law**
**411 Iberia Street**
**New Iberia, Louisiana  70560**
**(337) 365-2445**
**Counsel for Appellee:**
**Zerita Polk Depass**

SULLIVAN, Judge.

Earline York appeals the dismissal of her challenge to the will of her aunt, Juliette Bijou Polk, on summary judgment. Zerita Polk Depass, Mrs. Polk's sole legatee in the will, has answered the appeal, seeking damages for frivolous appeal and attorney fees for Ms. York's failure to respond to discovery. For the reasons given below, as well as those of the trial court in a detailed written ruling that we have attached as an appendix, we affirm. We further deny the additional relief requested on appeal.

## Procedural Background

Juliette Bijou Polk, a widow with no surviving children, died on December 8, 2003, at the age of ninety-one. On October 16, 2002, Mrs. Polk executed a will leaving her entire estate to Ms. Depass, who considered herself to be Mrs. Polk's niece by marriage.[1] On that same day, Mrs. Polk revoked an earlier will and a power of attorney that she had executed in favor of her niece, Ms. York.

In response to Ms. Depass's petition to probate Mrs. Polk's will, Ms. York filed a petition to annul the testament, alleging that Mrs. Polk lacked testamentary capacity, that Ms. Depass exerted undue influence in the making of the will, and that the will was invalid as to form because Mrs. Polk could not read at the time it was executed. Ms. Depass filed a motion for summary judgment, with supporting documents including two depositions of Mrs. Polk's treating physician, Dr. George Douglas Sagrera, affidavits from two LPNs who cared for Mrs. Polk at the nursing home where she resided at the time she executed the will, and affidavits from

---

[1]Ms. Depass's father, Matthew Polk, was married to the testator's sister, Edith Bijou Polk, although Ms. Depass was not a child of that union. Rather, Ms. Depass was born after that marriage, but as the result of Mr. Polk's relationship with another woman, Francine Wallace. In her deposition, Ms. Depass testified that she came to live with Matthew and Edith Polk when she was about fourteen years old.

numerous family friends who stated that they regularly visited with Mrs. Polk at the nursing home. Ms. York's opposition to the motion included selected medical records of Mrs. Polk and several depositions, including those of the attorney who prepared the will, James W. Schwing, Sr.; the witnesses present at the signing of the will, Jacob Stansbury and Juanita Boudreaux; and Mrs. Polk's ophthalmologist, Dr. Thomas Curry. After taking the matter under advisement, the trial court ruled in Ms. Depass's favor, finding there existed no genuine issue of material fact that Ms. York could meet her burden of proof to annul the testament. The trial court did not rule on Ms. Depass's motion to compel that was scheduled to be heard at the same time as the motion for summary judgment. On appeal, Ms. York argues that genuine issues of material fact exist as to (1) whether Ms. Depass exerted undue influence in coercing Mrs. Polk into naming her as sole heir; (2) whether Mrs. Polk was competent to execute a testament due to lack of mental and physical capacity; and (3) whether Mrs. Polk was unable to read due to a visual impairment, thereby invalidating the will for failure to comply with La.Civ.Code art. 1579.

**Opinion**

*Summary Judgment*

Appellate courts review summary judgments *de novo*, applying the same criteria as the trial court in deciding whether or not summary judgment should be granted. *Schroeder v. Bd. of Supervisors*, 591 So.2d 342 (La.1991). Concerning the burden of proof in summary judgment procedure, La.Code Civ.P. art. 966(C)(2) provides:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential

2

elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

As explained more fully below, Ms. York, the non-movant in the present case, will have the burden of proof at trial on the three issues she raises in this appeal.

*Assignment of Error No. 1: Undue Influence*

Louisiana Civil Code Article 1479 (emphasis added) provides that a donation *inter vivos* or *mortis causa* shall be declared null "upon proof that it was the product of influence by the donee or another person *that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.*" The burden of proof for one challenging a donation based on "undue influence" is found in La.Civ.Code art. 1483 (emphasis added):

> A person who challenges a donation because of fraud, duress, or undue influence, *must prove it by clear and convincing evidence.* However, if, at the time the donation was made or the testament executed, *a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption*, the person who challenges the donation need only prove the fraud, duress, or undue influence by *a preponderance of the evidence.*

For the purposes of this litigation, the trial court assumed that Ms. Depass was not related to Mrs. Polk by blood or affinity, then it applied the preponderance of the evidence standard to Ms. York's claims, without discussing whether a relationship of confidence also existed between Ms. Depass and Mrs. Polk. The trial court, nonetheless, concluded that Ms. York would not be able to meet even this lesser standard of proof, based upon the evidence introduced in support of and in opposition to summary judgment.

Concerning the type of influence that would result in the invalidity of a donation, Comment (b) to Article 1479 (emphasis added) provides in part:

> [E]veryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. *Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.*

The record reflects that Ms. Depass did contact attorney James Schwing to arrange for the preparation of Mrs. Polk's will. In her deposition, Ms. Depass testified that she did so at Mrs. Polk's request after Mrs. Polk became concerned about her financial affairs because she had not heard from Ms. York, who had possession of her checkbook, in several months. In affidavits, several family friends also stated that Mrs. Polk expressed displeasure at Ms. York's handling of her affairs, as well as feeling that Ms. York had "abandoned her" because Ms. York had discontinued caring for her when she entered the nursing home.

Ms. Depass testified that she called Mr. Schwing because he was the attorney who had previously handled the succession of Mrs. Polk's father, Prosper Bijou. Mr. Schwing testified that he met with Mrs. Polk on two occasions concerning her will. The first occurred in a common area of the nursing home, at which time Mrs. Polk told him that Ms. York had not been to see her and that she was having a hard time getting her money. Mr. Schwing testified that, while talking about mutual acquaintances, including his mother and family whom Mrs. Polk knew from church,

4

Mrs. Polk conversed "very lucidly," and that she appeared "emphatic" about what she wanted to do in her will. The second occasion occurred when he brought and read to her the completed will at the nursing home in the presence of witnesses.

Ms. York argues that several references in Mrs. Polk's medical records create genuine issues of material fact as to whether Ms. Depass committed fraud or exerted undue influence over Mrs. Polk, including that Ms. Depass represented to the nursing home that she was Mrs. Polk's niece, that Mrs. Polk was transported at least once from the nursing home to a bank, bringing into question the testimony about Mrs. Polk having difficulty getting her money, and that her physician, Dr. Sagrera, had prescribed medications for dementia and delusions. After reviewing the record, we must agree with the trial court that Ms. York has not come forward with any evidence that she will be able to meet even the lesser standard of proving undue influence by a preponderance of the evidence. The record reflects that Ms. Depass justifiably thought of herself as Mrs. Polk's niece, in that she was raised by Mrs. Polk's sister. We further find that Ms. Depass's actions in contacting Mr. Schwing and arranging payment for the will amount only to the "kindness and assistance" that is permissible under Article 1479, particularly given that her account of Mrs. Polk's displeasure with Ms. York's handling of her affairs is corroborated by other witnesses. Regarding Mrs. Polk's medical conditions, they are discussed more fully below and in the trial court's written reasons.

*Assignment of Error No. 2: Testamentary Capacity*

To have the capacity to donate *inter vivos* or *mortis causa*, a person must be able "to comprehend generally the nature and consequences" of his action. La.Civ.Code art. 1477. "Capacity to donate mortis causa must exist at the time the

testator executes the testament." La.Civ.Code art. 1471. A person challenging the capacity of a testator must prove lack of capacity at the time of the testament by clear and convincing evidence. La.Civ.Code art. 1482(A).

Concerning the role of medical evidence in suits challenging the validity of a will, the court stated in *Succession of Braud*, 94-668, p. 5 (La.App. 4 Cir. 11/17/94), 646 So.2d 1168, 1171, *writ denied*, 95-383 (La. 3/30/95) 651 So.2d 841:

> The caselaw is clear that proof of the presence of a mentally-debilitating condition at the approximate time that the will was executed is insufficient to prove lack of testamentary capacity at the time the will was executed by clear and convincing evidence, especially in light of conflicting evidence of the decedent's capacity at the actual time the will was executed. Even the fact that the decedent had previously been interdicted was insufficient to prove lack of testamentary capacity in [*Succession of*] *Cole*, 618 So.2d 554 [(La.App. 4 Cir.1993)].

Dr. Sagrera had treated Mrs. Polk since 1968. He described her as having an "irascible" personality and noted that "[s]he'[d] been firing me now for 10, 15 years." He had diagnosed her with progressive dementia and had prescribed numerous medications for various mental disorders, including depression, nervousness, anxiety, and delusional behavior. She had also been admitted on at least two occasions to psychiatric hospitals, where "she would typically stay in these kind of facilities for about three weeks, and she would have her medications adjusted." When discussing letters that he had previously written concerning her inability to make decisions for herself, Dr. Sagrera explained that he was referring to decisions relating to her care, such as her unwillingness to medicate herself and her refusal to go into the nursing home. He believed that she lost her ability to handle all her affairs in the last few months before her death in December of 2003, and before that time, her condition was one that "came and went." He explained that someone on the medications Mrs. Polk was taking could understand what a will was, and, more particularly, that Mrs. Polk

6

did understand the effects of a will. He described her as someone "who decided what she wanted to do, when she wanted to do it. And I don't know anybody who unduly influenced her. She was subject to change her mind frequently."

The two persons who witnessed Mrs. Polk sign her will, Mr. Stansbury and Ms. Boudreaux, had also known Mrs. Polk for a number of years. Mr. Stansbury, a real estate agent who had previously handled the sale of a house for her, testified that he had known Mrs. Polk for about sixty years and at one time had lived two blocks from her. Because of this relationship with her, he explained: "So if there's anything wrong with her health or anything, other than being in a wheelchair, I would notice that." He described Mrs. Polk as being attentive when Mr. Schwing read the will to her, and he remembered her stating that she understood what was read to her. He testified that Mrs. Polk did not appear to be confused or disoriented. Mrs. Boudreaux testified that she had known Mrs. Polk all of her life, as she had grown up about eight or nine houses down the street from her and Mrs. Polk had taken care of her when she was a baby. Ms. Boudreaux, who was Mr. Schwing's secretary, also recalled Mrs. Polk coming into their office when he handled a succession for her family. Ms. Boudreaux described Mrs. Polk as being "very alert, very awake" when the will was signed, recalling that Mrs. Polk stated that she remembered Mr. Stansbury and that she asked about Ms. Boudreaux's mother.

Based upon Dr. Sagrera's opinion that Mrs. Polk would have understood the effects of a will and the witnesses' observations of Mrs. Polk at the time the will was signed, we agree with the trial court's conclusion that Ms. York would not be able to prove by clear and convincing evidence that Mrs. Polk lacked testamentary capacity.

7

Accordingly, we find that the trial court properly granted summary judgment on this issue.

*Assignment of Error No. 3: Ability to Read*

The testator's ability to read is an element of testamentary capacity; therefore, because testamentary capacity is presumed, the opponent of a will bears the burden of proving by clear and convincing evidence that the testator could not read. *Succession of Young*, 03-1233 (La.App. 3 Cir. 3/3/04), 867 So.2d 139.

Dr. Thomas Curry, Mrs. Polk's ophthalmologist, testified that he had no reason to believe that she could not read without her glasses. Chad Trahan, an LPN who cared for Mrs. Polk at the nursing home, stated in his affidavit that Mrs. Polk would read to him on occasion from a book of prayers that she kept in her room and that he often saw her reading a newspaper or church bulletin. According to Mr. Trahan, Mrs. Polk's ability to read did not seem to fail until November of 2003, over one year after she had executed the testament at issue herein. Donna Snoddy, another LPN, also stated by affidavit that she often observed Mrs. Polk reading a newspaper and that Mrs. Polk spoke to her about the news articles she had read. We can find no evidence from Ms. York that contradicts the opinion of Mrs. Polk's ophthalmologist or the observations of these witnesses. Accordingly, we find no error in the trial court's grant of summary judgment on this issue.

*Answer to Appeal*

In her answer to appeal, Ms. Depass seeks damages for frivolous appeal and expenses associated with the filing of a motion to compel that was scheduled to be heard with the motion for summary judgment. We decline to award either relief. Given that so few cases have decided the issues of undue influence and testamentary

8

capacity on summary judgment, we cannot conclude that this appeal is frivolous. We further find no abuse of discretion in the trial court's refusal to award expenses on the motion to compel, as the trial court evidently concluded that the requested information was not necessary to the disposition of this case.

## Decree

For the above reasons, the judgment of the trial court is affirmed in all respects. Costs of this appeal are assessed to Appellant, Earline York.

**AFFIRMED.**

# APPENDIX

| | | |
|---|---|---|
| SUCCESSION OF | * | SIXTEENTH JUDICIAL DISTRICT |
| JULIET[TE] BIJOU | * | |
| POLK | * | PARISH OF IBERIA |
| | * | |

PROBATE NO.18422          *          STATE OF LOUISIANA
*******************************************************************************

## REASONS FOR JUDGMENT

On December 21, 2004, in Franklin, St. Mary Parish, Louisiana, Division "G", Sixteenth Judicial District Court, the parties in the above captioned matter appeared for trial on a motion for summary judgment. Earline York filed a motion to continue to admit additional deposition testimony of Dr. Thomas Curry. The court denied the motion to continue and took the matter under advisement. Earline York sought supervisory writs and requested a stay of the proceedings. The court granted the stay of proceedings.

On May 10, 2005, the Third Circuit Court of Appeal denied supervisory writs. Thereafter, the parties submitted post trial briefs and additional deposition testimony of Dr. Thomas Curry. The court admitted into evidence on trial of the motion for summary judgment the deposition testimony of Dr. Thomas Curry. The court publishes its reason for judgment sustaining and/or granting summary judgment dismissing the petition of Earline York, as a matter of law, on grounds that there is a lack of any genuine issue of material fact regarding the validity of the Last Will and Testament of Juliet[te] B. Polk executed on or about October 16, 2002.

## APPEARANCES

Plaintiff, Earline York, through her attorney of record:

1.

CARL PERKINS
ATTORNEY AT LAW
728 N. THEARD STREET
COVINGTON, LOUISIANA 70433

Defendant, Zerita Polk Depass, through her attorney of record:

2.

STEPHEN F. MESTAYER
MESTAYER AND MESTAYER
110 E. PERSHING STREET
POST OFFICE BOX 12340
NEW IBERIA, LA 70562-2340

## BACKGROUND

On or about October 16, 2002, at age ninety, Juliet[te] B. Polk executed a Last Will and Testament designating Zerita Polk Depass as Executrix and sole heir of her estate. The Last Will and Testament of Juliet[te] B. Polk was executed in the presence of witnesses, Juanita Boudreaux and

Jacob Stansbury and Notary Public, Attorney James W. Schwing. Ms. Polk died on December 8, 2003 in the city of New Iberia.

On or about April 1, 2004, Earline York filed suit to annul the Last Will and Testament of Juliet[te] B. Polk dated October 16, 2002. In Paragraph 5 of the Petition To Annul, York attacked the validity of the Last Will and Testament of Juliet[te] B. Polk in the following particulars:

> "5.
> The Proported Testament should be annulled for the following reasons and on the following grounds:
> a. Decedent's treating physician has indicated that decedent's
>
> mental and physical condition so impaired her mind and rendered her unable to understand generally the nature and consequences of the disposition that she was making in the Proported Testament so as to render the testament invalid for lack of capacity to donate as provided under the Louisiana Civil Code Articles 1471 and 1477; or alternatively.
>
> b. The disposition[s] of the Porported Testament are the product of influence by another person that so impaired the the volition of the donor/decedent so as to substitute the volition of other persons for the volition of the donor/decedent so as to render the testament invalid for reason of undo [sic] influence as provided by Louisiana Civil Code Article 1479; or alternatively
>
> c. The last will and testament is invalid as to error or form such as to make the testament invalide [sic] as Ms. Polk could not read at the time of the execution of the will because of her condition.["]

On or about September 14, 2004 Zerita Polk Depass filed a motion for summary judgment alleging the lack of any genuine issues of material fact regarding the validity of the Last Will and Testament of Juliet[te] B. Polk dated October 16, 2002.

## LEGAL ANALYSIS

In Hayes v. Autin, 685 So.2d 691[, 694-95] (La. App. 3 Cir. 12/26/96 ), [*writ denied*, 97-281 (La. 3/14/97), 690 So.2d 41], the Third Circuit Court of Appeal provided a clear and succinct analysis of Louisiana jurisprudence and statutory requirements underlying summary judgment procedure[1] in the following text:

---

[1]Art. 966. Motion for summary judgment; procedure
A.(1) The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiffs motion may be made at any time after the answer has been filed. The defendant's motion may be made at any time.

(2) The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends.

B. The motion for summary judgment and supporting affidavits shall be served at least fifteen days before the time specified for the hearing. For good cause, the court shall give the adverse party additional time to file a response, including opposing affidavits or depositions. The adverse party may serve opposing affidavits, and if such opposing affidavits are served, the opposing affidavits and any memorandum in support thereof shall be served pursuant to Article 1313 at least eight days prior to the date of the hearing unless the Rules for Louisiana District Courts provide to the

"A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966. In Smith v. Our Lady of the Lake Hosp., 93-2512 (La.7/5/94); 639 So.2d 730, the Louisiana Supreme Court defined the operative provisions of La. Code Civ. P. art. 966:

> A "genuine issue" is a "triable issue." Toups v. Hawkins, 518 So.2d 1077, 1079 (La.App. 5th Cir.1987) (citing Brown v. B & G Crane Service, Inc., 172 So.2d 708 (La.App. 4th Cir.1965)], supra). More precisely, "[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes."
>
> * * *

A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Penalber v. Blount, 550 So.2d 577, 583 (La.1989). "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." South Louisiana Bank v. Williams, 591 So.2d 375, 377 (La.App. 3d Cir.1991), writs denied, 596 So.2d 211 (La.1992). Smith, 639 So.2d at 751.

* * *

[2] Under the amended statute, the initial burden of proof remains with the mover to show that no genuine issue of material fact exists. However, under Art. 966(C), once the mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. The amendment to Art. 966 brings Louisiana's standard for summary judgment closely in line with the federal standard under Fed. Rule Civ. Proc. 5.6(e), which was summarized by the Louisiana Supreme Court in Sassone:

> In the federal system, when the nonmoving party bears the burden of proof at trial, there is no genuine issue of material fact if the nonmoving party cannot come forward at the summary judgment stage with evidence of such sufficient quantity and quality for a reasonable juror to find the party can satisfy his substantive evidentiary burden. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed.2d 265 (1986). The court in Celotex stated:
>
> In our view, the plain language of Rule 56(c) mandates the entry of

---

contrary. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.

C.(1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.

(2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

D. The court shall hear and render judgment on the motion for summary judgment within a reasonable time, but in any event judgment on the motion shall be rendered at least ten days prior to trial.

E. A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case.

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. 477 U.S. at 322-23, 106 S.Ct. at 2552.

The "purpose of summary judgment in the federal system is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L. Ed.2d 538 (1986). Sassone, 626 So.2d at 351.["]

Evidence on trial of the motion for summary judgment was derived from affidavits and depositions filed into the record:

## DR. DOUGLAS R. SEGRERA

Dr. Douglas R. Segrera maintained a general practice of medicine in New Iberia, Iberia Parish, Louisiana. Dr. Segrera offered deposition testimony on July 30, 2004 and December 17, 2004 as Juliet[te] Polk's primary treating physician from approximately 1966 until her death December 8, 2003. He conducted medical examinations of Juliet B. Polk on August 16, 2002 and October 29, 2002. As treating physician, Dr. Segrera offered an opinion that Juliet B. Polk alternated between mental states described as clear and lucid or depression with mental aberrations.

In late August or early September 2001, Ms. Polk suffered complications from a brain tumor. The brain tumor was surgically removed. However, Ms. Polk experienced seizures as a complication of the surgery. Dr. Segrera did not consider the seizures as a source of significant disruption to Ms. Polk's mental state.

Approximately April 2002, Ms. Polk's health and mental faculties declined. She refused to take medications and/or medical treatment. At some point Dr. Segrera felt she lost the capacity to make decisions regarding medical care. She was involuntarily admitted to New Iberia Manor North Nursing Home as a patient requiring skilled nursing care.

During the period she resided in the nursing home, Ms. Polk was hospitalized on several occasions for psychiatric evaluations resulting from observations of depression and lack of control of verbal statements. She was diagnosed with "progressive dementia" and treated for "depression and mental aberrations."

Deposition testimony from Dr. Segrera July 30, 2005 at page 7, line 17 reflect[s] Ms. Polk's mental condition surrounding execution of a Last Will and Testament on October 16, 2002:

Mr. Lea Q.     I understand you wrote a letter December 22nd, 2003, essentially which states she has progressive dementia since 2001 and she has entered into a nursing home in April of 2002. Excuse me. And when she was admitted to a nursing home in April of 2002 she was definitely not able to make decisions related to her own care. And I guess that has to do with her unwillingness to medicate herself and the other things we have just mentioned?

Dr. Segrera A.     That's correct.

Mr. Lea Q.     You also mention in the letter that she had previously required multiple hospitalizations, I assume based on her difficulty in caring for herself, some of the hospitalizations including psychiatric hospitalizations. Can you describe why was it she needed psychiatric hospitalization?

Dr. Segrera A.     Yes. She went to a particular type of psychiatric hospitalization and it was called a general psychiatric hospital. She went to Pathways here New Iberia and she also I believe went to one Vermillion. They were related to her depression that she had in relation to her physical illnesses. They were related to her personality, too, because she got to the point at times where she couldn't control the things she said and did, so that the caretakers around her actually asked that she be seen by a psychiatrist, and one of the psychiatrist saw her and she would typically stay in these kind of facilities for about three weeks, and she would have her medications adjusted.

Mr. Lea Q.     And what sort of medications were those?

Dr. Segrera A.     Those were antidepressants primarily, but also some, they're called psychotropic agents. They are mood stabilizers and tranquilizers.

Mr. Lea Q.     And you said she couldn't control herself. What did you mean by that?

Dr. Segrera A.     Well, she would be angry with every body. She would refuse to do things that were reasonable, and she would refuse treatments so that she ended up in these medical facilities for that reason, to treat her depression, to treat her anger, to treat her mental aberrations that she had.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition testimony from Dr. Segrera on July 30, 2005 at page 10, line 17:

Mr. Lea Q. Based on your testimony today, after she was admitted to the nursing home do you believe that she had the ability to handle her own affairs?

Dr. Segrera A. Up to some point she did.

Mr. Lea Q. Based on your prior testimony of her dementia and her continuing dementia, do you think that she understood, she would understand what she was doing in rewriting a will after she was placed into the nursing home? Do you think she understood what it meant to give her entire estate away?

Dr. Segrera A. I'm not sure at what point she lost that ability. She lost it definitely at the end, the last few months; but she had periods where she was clear and lucid, but she had lots of periods when she wasn't, where she wouldn't understand that at all.

Mr. Lea Q. As I understood it, her condition was a progressive condition where she got worse and worse. And at what point do you think, if you can tell us, that she had lost the ability for sure and she was not able to handle her affairs, didn't know what she was doing if she was to give away her estate?

Dr. Segrera A. The last few months, I would say.

Mr. Lea Q. And before that, that was a condition that came and went?

Dr. Segrera A. That's correct.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A final excerpt from Dr. Segrera's deposition July 30th, 2004 at page 12, line 19:

Mr. Lea Q. Help me out here if I'm mistaken, but not being able to make decisions about her own care and not being able to understand the importance of taking her medication and/or even taking her medication, she couldn't make those decisions but you think that she could make decisions about her property ownership and so forth?

Dr. Segrera A. That's a very tough question to answer. I don't know. We didn't discuss her property. Until near the end she knew me and she knew where she was until the last few months. The question about whether or not she knew what to do with her property, I just don't know how to answer that. We didn't discuss those kinds of things.

Mr. Lea Q. The things you did discuss, though, were things like her medication and you understood that she was refusing to take it sometimes.

Dr. Segrera A. That's correct.

Mr. Lea Q. For no good reason?

Dr. Segrera A.    That's correct.

Mr. Lea Q.    Firing you for no good reason?

Dr. Segrera A.    That's right.   She could be a very irascible person.  She would change her mind about lots of things.

Mr. Lea Q.    In the same conversation?

Dr. Segrera A.    The same conversation.

Mr. Lea Q.    The same sentence?

Dr. Segrera A.    Well, I don't know if it was the same sentence, but the same conversation.   She would have very conflicting views about lots of things.

EXAMINATION BY MR. MESTAYER:

Mr. Mestayer Q.    If we assume that what a will is is a document that someone signs that names someone or more than one or a firm to get their property when they die, if we assume that, do you believe that Mrs. Polk would have known what that was, what a will was?

Dr. Segrera A.    Yes, I would think she would know what a will was.

Mr. Mestayer Q.    Okay.   So on the day her will was purportedly signed on October 16th of 2002, she could have had a completely lucid and clear state at the time she signed her will?

Dr. Segrera A.    That's possible.

****************************************

Mr. Mestayer Q.    Did Mrs. Polk ever express anger to you about having to go to the nursing home and having to leave her home?

Dr. Segrera A.    Yes.  She didn't want to go.  Definitely.  I forced her to go.

Mr. Mestayer Q.    Okay.   But could that have had anything to do with her refusal to take medicine or her firing you or any of that kind of stuff?

Dr. Segrera A.    No.   She's been firing me now for 10, 15 years.

Mr. Mestayer Q.    Oh, really?   Okay.   So when she started firing you was she suffering from dementia?

Dr. Segrera A.    No.   That was just her personality.

Mr. Mestayer Q.    That's her personality?

Dr. Segrera A.    She fired people regularly.

Dr. Segrera expressed an opinion suggesting the possibility that Ms. Polk's mental state was clear and lucid on October 16, 2002. Except for a period within a few months of death, Dr. Segrera could not provide a definitive date declaring Ms. Polk mentally incapable of conducting her affairs.

## DR. THOMAS CURRY

Dr. Thomas Curry provided deposition testimony on December 8, 2004. He is licensed Opthomologist and practiced for eleven years. On August 30, 2000, he treated Polk for complaints of stabbing pain around her eyes. He did not find the presence of eye disease, except for previous cataract surgery. Dr. Curry found Ms. Polk's vision was appropriate for a ninety one year old and would deteriorate with age.

## ALLEN J. SPARROW

Allen J. Sparrow offered testimony in affidavit form dated February 25, 2004 indicating he knew Juliet[te] Polk as a good friend for approximately sixty (60) years. In 2002 he recalled daily visits with his mother in the same nursing home where Ms. Polk resided as a patient. Allen and Juliet[te] Polk discussed current events with the aid of daily newspaper reports. Sparrow felt Ms. Polk was lucid and normal in October 2002.

## DORIS S. ALLEN

Doris S. Allen offered testimony through an affidavit dated August 13, 2004. Allen was seventy-five (75) years old and a life long friend of the decedent on. In 2002, she visited Ms. Polk twice weekly and discussed their weekly church bulletin. In October, 2002, Allen observed Ms. Polk engaged in reading some material. She did not observe any period of time or circumstance when Ms. Polk suffered or manifested symptoms associated with loss of memory. At all times, Ms. Polk conducted normal, coherent conversations. Ms. Polk confided to Doris that she felt abandoned by Earline York.

## HELEN JOHNSON

Helen G. Johnson provided an affidavit dated August 12, 2004. She is seventy-seven (77) years old and a lifelong friend of Ms. Polk. Johnson was Polk's beautician and visited Ms. Polk every two weeks at the nursing home. She did not believe surgery affected Polk's mental faculties. Polk conducted normal conversations. Polk discussed displeasure with Earline York. Polk felt abandoned and requested York return a checkbook. Additionally, she desired to re-write her will to exclude York. On a nursing home visit, Johnson observed Ms. Polk's was not groomed properly. She contacted Depass to care for Ms. Polk. Depass continue to care for Polk until her death.

## ROBERT AND BONNIE RAGGETTE

Robert and Bonnie Raggette, husband and wife, provided an affidavit indicating that they were sixty-one (61) and sixty-five (65) years, respectively and very good friends with Ms. Polk. Since 1995, they visited Polk every six (6) weeks. They knew she was "educated" and "articulate." She exhibited good memory and spoke in normal conversational tone. Polk expressed displeasure with York and a desire to compensate Depass for providing care.

## CHAD TRAHAN

Chad M. Trahan provided affidavit testimony dated May 28, 2004. He was admitted to practice as a Licensed Practical Nurse (LPN) in 1992. Trahan was employed at New Iberia Manor North Nursing Home as a day nurse assigned to Polk. He cared for Polk until November 2003. She always appeared in control of her mental faculties. She was intelligent, knowledgeable, and could conduct normal conversations. On the day she executed a last will and testament, Ms. Polk appear oriented to time and circumstances.

## DONNA SNODDY

Donna Sno[d]dy provided an affidavit dated November 8, 2004. She is admitted to practice as a Licensed Practical Nurse (LPN) in 1980. She is employed at New Iberia Manor North Nursing Home. Sno[d]dy was assigned as one of Polk's day nurses. She provided care and treatment for Polk during the period she resided at the nursing home. In October 2002, Polk conducted "normal, lucid" conversations. She did not appear confusion or suffer loss of memory. She did not "suffer from any mental deficit whatsoever."

At times Polk was uncooperative with the nursing home staff because she did not want to reside at the nursing home. As a result of this uncooperative behavior, she was referred to a psychiatric hospital. The psychiatric hospitalizations did not affect capacity, ability to read and understand a last will and testament. She read and discussed newspaper articles and current events. Sno[d]dy believes Depass did not control or manipulated Polk physically or mentally. Polk was a strong-will and opinionated person.

## ZERITA POLK DEPASS

Zerita Polk Depass provided testimony by affidavit dated September 15, 2005. She is the daughter of Matthew Polk, Juliet[te] Polk's brother- in- law. Depass was raised in the home next door to Polk and they had a close relationship. After the death of Juliet[te] Polk's husband, Johnson Polk, Depass provided care for Ms. Polk in the form of transportation, handling bill payments, security system, and other everyday needs.

Depass recalls Earline York attended to Juliet[te] Polk's affairs after she was diagnosed with a brain tumor during the summer 2001. York attended to Polk's care for a couple of months following surgery. After admission to the nursing home, Depass felt that Polk was neglected in some respects. Depass began to attend to Polk's affairs. She visited the nursing home twice daily until Polk's death. Depass felt Polk had full control of her mental faculties from the time she entered the nursing home until two months before her death. She did not suffer a loss of memory or inability to conduct a normal conversation. Polk expressed a displeasure of York to Depass. She asked Depass to contact Attorney James Schwing to secure return of a checkbook and revoke power of attorney granted to York. James Schwing prepared the legal documents to achieve Polk's requests.

## JAMES SCHWING

Attorney James Schwing provided an affidavit dated September 14, 2004. He is an attorney and prepared wills over the course of forty-four (44) years. He met with Polk. She expressed a displeasure with York, requested return of a checkbook and revocation of the power of attorney to

York. During the meeting, Polk always appeared to have control of her mental faculties.

Schwing prepared a document to revoke Power of Attorney to York, a Power of Attorney to Depass and Last Will and Testament dated October 16, 2002. He read the Last Will and Testament to Polk. She indicated that the Last Will and Testament expressed her intentions. Schwing believed Polk removed her legacy from York to Depass because she felt abandoned by York. Schwing confirmed that Polk could read, apply her signature to documents and appeared to understand the nature and consequences of executing a will to dispose of her property after death.

## CAPACITY TO DONATE

Capacity to confect a donation inter vivos or mortis causa means a person must be able to comprehend generally the nature and consequences of the disposition that he or she makes. **La. Civ. Cd. 1477.** There is a presumption in favor of testamentary capacity. **Cupples v Pruit[t],** 754 So2d 328 (La. App.2nd Cir. 2000)[, *writ denied*, 00-945 (La.5/26/00), 762 So.2d 1108]. A person who challenges the capacity of a donor must establish by clear and convincing evidence that the donor lacked capacity at the time the donor executed the testament. **La.Civ.Cd. 1482.** Proving a matter by "clear and convincing evidence" requires establishing that the existence of a disputed fact is highly probable. **Succession of Bilyeu,** 681 So2d 56, (La. App. 2nd Cir. 1996).

At trial, York bears the burden of proof through "clear and convincing evidence" Polk lacked the capacity to executed a valid last will and testament on October 16, 2002. **La. Civ. Cd 1482** Juliet[te] B. Polk is presumed to possess testamentary capacity on October 16, 2002. In addition, Depass submitted several affidavits by lay witnesses supporting the contention that Polk had testamentary capacity to execute a last will and testament. Further, Depass relies on Dr. Segrera's opinion that Juliet[te] Polk's mental state alternated between clarity and [] confusion.

Dr. Segrera rendered a medical opinion that Polk could not make reasonable decisions related to her health care. This opinion resulting in Ms. Polk's admission to a nursing home. Dr. Segrera rendered another opinion finding Juliet[te] Polk understood the consequences of executing a last will and testament. Finally, Dr. Segrera rendered an opinion suggesting the possibility that Juliet[te] B. Polk had a clear and lucid mental state on October 16, 2002 under medications described as antidepressants, psychotropic drugs, mood stabilizers and tranquilizers. York failed to establish a prima facie case for invalidity of the last will and testament on grounds of lack of capacity to donate.

## TESTAMENTARY FORM

It is settled jurisprudence that testamentary capacity is always presumed and thus a presumption exists in favor of the validity of the last will and testament. Succession of Schmidt, 53 So.2d 834 ([La.]1951); Succession of Guidry, La.App., 160 So.2d 759 (3d Cir. 1964); Succession of Lambert, 169 So. 453 (1936); Succession of Mithoff, 122 So. 886 (1929). In Guidry v. Hardy, 254 So.2d 675 (3d Cir. 1971)[, *writ denied*, 256 So.2d 441 (La.1972),] the burden of proving lack of testamentary capacity at the time the will was executed is upon the party alleging it. McCarty v. Trichel, 46 So.2d 621 (La.1950); Condon v. McCormick, 134 So.2d 619 (3d Cir. 1961); Lewis v. DeJean, 251 So.2d 124 (3d Cir. 1971). The court further stated that the degree of proof required to overcome the presumption of testamentary capacity is similar to that required in criminal cases to rebut and overcome the presumption of innocence which the law creates in favor of a person who is on trial for a crime. Succession of Mithoff; Succession of Guidry; Succession of Lambert.

Depass filed summary judgment on grounds that there is a lack of any genuine issue of material fact exist in determining whether Polk could read and understand at the time of executing the Last Will and Testament. Several affidavits and depositions were submitted on summary

judgment. York opposes summary judgment on grounds; (a) March 2003 Polk could not read small print; (b) she was legally blind when not wearing glasses; and the witnesses to the last will and testament failed to indicate that Polk had glasses on at the time of executing the will.

In the **Succession of Harris,** 329 So.2d 493[, 494] (La.4th Cir.1976)[, *writ denied*, 332 So.2d 862 (La.1976)], the Fourth Circuit Court of Appeals held:

["](T)hose who know not how or are not able to read, cannot make dispositions in the form of the will provided lbr in R.S. 9:2442. . .."La.R.S. 9:2443.

We decide that a testator's disability to read, with his ordinary eyeglasses, type sized smaller than 10 mm does not invalidate his will typed in type sized about 2 mm. The testator who can only read his will with his eyeglasses is "able to read" within the statute, and the testator who can only read his will with a five-power or stronger magnifying lens is also "able to read" (if he knows how, as our testator did). Appellant proved, by the testimony of the testator's optician, that the testator could not read this will with his ordinary eyeglasses. But the optician also testified there was "a good chance" that the testator could have read larger type of 5, 6 or 10 mm size.

The statute does not require recital or proof that the will was actually read by the testator. Therefore, that the testator did not read the will does not invalidate it; Estate of Moreau v. Moreau, La .App.3rd Cir., 1972, 261 So.2d 293, writ refused 62 La. 193, 262 So .2d 789. It is thus immaterial that our will's witnesses testified that the testator did not use any magnifying device in order to read the will at the time of its signing.

In **Succession of Smith,** 261 So.2d 679[, 681] (La.2nd Cir.1972) the Second Circuit Court of Appeal rendered a similar analysis:

[T]he testator Hezekiah Smith had the mental capacity to confect the will of August 30, 1971 and was capable of reading at the time of its confection. The testimony of witnesses that, although decedent's eyesight was failing shortly before his death, he could see well enough at time of confection of will to get around his house and his hospital room and could see well enough to sign his name properly on designated line of will [was sufficient to establish that decedent had mental capacity to confect a will and was capable of reading at time of its confection; accordingly, presumption in favor of validity of will was not overcome.]

York failed to overcome the presumption of validity of the testament through the testimony related to Ms. Polk's poor vision rather than Ms. Polk's literacy.

**UNDUE INFLUENCE**

A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. **La. Civ. Cd 1479.** A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence.

However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence. La. Civ. Cd. Art. 1483.

Depass alleges she did not place[] an undue influence or coercion against Polk to designate Depass as the sole heir of her estate. For purposes of this litigation, the court will assume the lack

of a relationship between Juliet[te] B. Polk and Zerita Polk Depass on account of blood or affinity.

At trial, York must prove fraud, duress, or undue influence by a preponderance of the evidence. Depass presented evidence that Polk felt abandoned by York. Several witnesses testified that Polk expressed displeasure with York. Dr. Segrera testified tha[t] Ms. Polk changed her mind frequently. York has failed to present any evidence to establish the Last Will and Testament of Juliet[te] B. Polk dated October 16, 2002 is the result of fraud, duress, coercion or undue influence.

## RENDITION OF JUDGMENT

The Court will sign a judgment, upon presentation, consistent with reasons for judgment rendered in these proceedings within ten (10) days of the date reasons for judgment are filed with the clerk of court. Any counsel of record may enter a written objection to the form or substance of the proposed final judgment prior to signature and rendition.

Upon receipt of an objection to a proposed final judgment, a telephone conference, without the benefit of a court reporter, shall convene, with the attendance of all interested counsel of record, to resolve and/or reconcile differences respecting rendition of judgment, unless there is an written objection opposed to such a conference.

Any party may move for a contradictory hearing to draft judgment. Thereafter the court will render final judgment in accordance with its rulings findings derived from the hearing.

READ AND SIGNED this __29th__ day of ___September_. 2005 at New Iberia, Iberia Parish, Louisiana.

_____
CHARLES L. PORTER
DISTRICT JUDGE